# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CSL SILICONES INC.,

             Plaintiff,

v.                                      3:14-cv-01897 (CSH)

MIDSUN GROUP INC.,

             Defendant.

## RULING ON DEFENDANT'S RENEWED MOTION FOR PROTECTIVE ORDER

HAIGHT, Senior District Judge:

Defendant Midsun Group Inc. ("Midsun") moves pursuant to Fed. R. Civ. P. 26(c)(1)(g),[1] for this Court to enter an order protecting it against any disclosure as to certain of Plaintiff's discovery requests. Doc. 60. It does so mostly on the ground that the information contains purported confidential trade secrets. Defendant earlier filed a nearly identical motion for a protective order. Doc. 40. However, on the same date that Plaintiff filed its opposition to that motion, the parties filed to the docket a jointly-filed Stipulated Protective Order (the "SPO"). Doc. 50. On January 8, 2016, the Court held a hearing on the motions pending before it in this case, including Defendant's earlier motion for a protective order. In the Court's ultimate ruling, it held as follows as to that motion:

> As to the protective order, the parties filed to the docket a stipulated protective order that may seem to obviate the need for a ruling by the Court, [Doc. 50], although the issue was not so clear given counsels' statements at the hearing. The parties are directed to confer regarding the status of [this] motion[]. In the meantime, the Court finds it administratively prudent to DENY [THE] MOTION[] WITHOUT PREJUDICE to refiling following the parties' conference on these issues.

---

[1] Defendant incorrectly refers to Fed. R. Civ. P. 26(c)(G), a nonexistent provision.

*CSL Silicones Inc. v. Midsun Grp. Inc.*, 2016 WL 1060189, at *12 (D. Conn. Mar. 15, 2016). Evidently, the parties have now conferred, to no avail, leading Defendant to file its renewed motion for a protective order on March 25, 2016.  This Ruling resolves Defendant's renewed motion.

## I.    DISCUSSION

The Federal Rules envision a broad scope of discovery in civil actions.  Specifically,

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).  Clearly, however, discovery is far from absolute.  Relevant here are two such avenues for withholding material from discovery.  *First*, grounded in Rule 26(b)(1) itself, a party need not produce material that is not "relevant to any party's claim or defense."  *Second*, Rule 26(c)(1)(G) allows a party to move for a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."

Prior to assessing Defendant's specific arguments, the Court must make a preliminary note as to Defendant's submissions.  A continuing feature of its papers submitted to this Court, Defendant's papers on the instant motion are far from a model of clarity.  For example, under the heading "TRADE SECRETS: Interrogatory 7, 13; Request for Production 36, 37, 39 and 40," Defendant makes arguments as to the relevance of  Interrogatory #8.  Doc. 60, at 7.  Note that its heading makes no indication that what follows will contain an objection as to relevance, rather than

trade secrets, and makes no mention of Interrogatory #8.  This is just one instance of the conflation within Defendant's motion of its arguments as to relevance and as to trade secret protection.  *See*, *e.g.*, Doc. 60, at 7 ("The foregoing is a trade secret.  None of these queries relate to the *Polaroid* factors.").  The relevance of the requested documents, and whether they are protected trade secrets, are entirely independent and separate avenues of inquiry.

In light of the sloppiness of its papers, it is simply unclear the exact relief Defendant requested.  As another notable example, Defendant expressly summarizes on page one of its memorandum of law that "[t]his motion addresses" Plaintiff's interrogatories 7, 8, 12, and 13, and Plaintiff's "requests for product [*sic*] 36, 37, 39, 40."  Doc. 60, at 1.  However, the motion then goes on to raise issues as to other discovery requests, specifically, Plaintiff's interrogatories 6, 7, 9, 12, 13, and 14 and requests for production 27, 28, and 32.  Then, Defendant somehow claims in its reply brief that "had Plaintiff carefully read Defendant's renewed motion it <u>does not</u> extend to Interrogatory 6," "<u>does not</u> extend to Interrogatory 14," and "<u>does not</u> extend to Request for Production 32."  Doc. 69, at 6.  This is non-sensical.  For example, its memorandum expressly states: "Requests 28 and **32** seek 'the classes or types of purchasers to whom Defendant's goods or services' under Defendant's marks.  These are confusing and speculative, and together with Interrogatories **6**, 7, 12, 13 and **14** are not limited in scope or time."  Doc. 60, at 9 (emphases added).

In light of the above, the Court will take Defendant at its word and presume the motion only seeks a protective order as to Plaintiff's interrogatories 7, 8, 12, and 13, and Plaintiff's requests for production 36, 37, 39, and 40.

### A.    Relevance

The challenged discovery requests seek information and documents as to the composition,

formulation, design, development, sourcing, and testing of Defendant's products alleged to have been sold under Plaintiff's mark. Defendant argues any such information is irrelevant because "[n]o issue in the current cases depends, for its resolution, on knowledge ascertainable from the disputed [discovery requests]." Doc. 60, at 2. Plaintiff responds that because such documents relate to the relative quality of the two products, they are relevant. Doc. 68, at 6. It is true that a central factor of the "likelihood of consumer confusion" test arising out of *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2d Cir. 1961) is the "respective quality of the products." *Int'l Info. Sys. Sec. Cert. Consortium, Inc. v. Security Univ., LLC*, – F.3d –, 2016 WL 2893172, at *5 (2d Cir. May 18, 2016). Plaintiff also points out that if Midsun's product is of inferior quality, there is an increased likelihood that it faces actual damages upon confusion. The Second Circuit has spoken specifically to these twin relevancies of the quality of a product in a trademark infringement suit:

> Essentially, there are two issues with regard to quality, but only one has relevance to determining the likelihood of confusion. If the quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, i.e., through dilution of the senior user's brand. . . . *[S]ee, e.g., Lois Sportswear*, 799 F.2d at 875. A marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user. Conversely, where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution. *Hasbro*, 858 F.2d at 78; *see, e.g., Lois Sportswear*, 799 F.2d at 875.

*Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460-61 (2d Cir. 2004); *see also Guthrie Healthcare Sys. v. Contextmedia, Inc.*, – F.3d –, 2016 WL 3245039, at *12 (2d Cir. June 13, 2016) ("Differences in relative quality as between a senior user's and a junior user's merchandise primarily affects the potential for harm to the senior user's reputation, and can also affect the likelihood of consumer

-4-

confusion.").[2]

Defendant does not seem to take issue with these principles. Rather, Defendant argues that the challenged discovery requests simply do not relate to the relative quality of the at-issue products. For example, it argues that a "chemical formula of a mixture, formulation or composition, is not the thing itself, but either a recipe or a short-hand expression taking the form of a group of symbols or an equation, from which a material substance might, be created." Doc. 60, at 5.

Defendant's argument can be quickly dispatched. There can be no question that the quality of a final product is impacted by the component parts of that product and the sourcing thereof, as well as its process of formulation and its testing. This is especially so with a niche industrial product being sold to sophisticated consumers. For example, if industrial actors in need of a silicone-coating product can easily ascertain the difference between CSL's 570 and Midsun's 570 due to Midsun's use of less effective component materials, there is less a chance that those actors will be confused by the similarities of the marks. It follow as a matter of course that information into those component materials is discoverable when litigating the likelihood of confusion.

Plaintiff aptly points to *Johnson & Johnson Consumer Companies, Inc. v. Aini*, 540 F. Supp.2d 374, 391 (E.D.N.Y. 2008), in which the court held that the quality element of the likelihood of confusion test was directly impacted by the chemical composition of the Defendant's product.[3]

---

[2]  An interesting corollary of these principles is that to the extent Plaintiff proves—as it has argued, [Doc. 19], at 14—that Midsun's products are inferior to its products, it is actually detracting from its trademark infringement claim by demonstrating a lesser likelihood of confusion.

[3]  The Court notes, however, that the *Johnson & Johnson* court erred in its ultimate application of the quality factor. It held that "the fact that Defendants' products barely contained any of the active skin bleaching ingredient strongly tips the scales in Plaintiff's favor with respect to the quality factor." 540 F. Supp.2d at 391. However, for the reasons stated in *Savin Corp.*,

For its part, Defendant offers no authority for a court ever determining that information as to the composition, creation, or testing of a product being sold under an allegedly infringing mark is not discoverable in a trademark infringement case.  Rather, it feebly attempts to distinguish *Johnson & Johnson*.  It does so first by mischaracterizing the impact of the case, claiming it is irrelevant because it "was squarely a <u>counterfeit product case</u>," that "[t]here is no such allegation being made by Plaintiff in this litigation," and that "Plaintiff fails to make this important and critical distinction though clearly having an obligation to do so."  Doc. 69, at 4.  It is Defendant that has approached the limits of its obligations to this Court.  The *Johnson & Johnson* court was assessing a cause of action brought under the exact same statute under which Plaintiff brings suit, and applying the exact same likelihood of confusion test that controls in this case.  540 F. Supp.2d at 388 ("In order to prevail on a trademark infringement claim under sections 32 and 43(a) of the Lanham Act (15 U.S.C. §§ 1114 and 1125(a), respectively), Plaintiff must demonstrate the following two elements: (1) that Plaintiff is the owner of a valid trademark and (2) that there is a likelihood of confusion by consumers.").  Defendant then offers the irrelevant distinction that because it was plaintiff in that case that conducted the testing to ascertain the composition of the at-issue product, no one asked the "Defendant [to] turn over its product formulation."  Doc. 69, at 4-5.  In so arguing, Defendant has again conflated its trade secret and relevancy objections.  No matter how the information was received in that case, *Johnson & Johnson* stands for the unremarkable proposition that information as to the component elements of a product is relevant to determining if that product was illegally sold

this gets it backwards.  A showing of inferior quality should tip the scales in the favor of defendant, as a markedly inferior product is *less* likely to cause consumer confusion. Nevertheless, the larger point remains: composition of a product allegedly sold under an infringing mark is relevant to the quality of that product when assessing likelihood of confusion.

under an infringing trademark.  The discovery requests at issue in this motion seek material and information relevant to Plaintiff's claim.  Defendant's motion on this ground is denied.

**B.   Trade Secrets**

Defendant next argues that the information sought by Plaintiff constitutes "highly confidential 'trade secrets'" pursuant to Connecticut law that should thereby be entirely immune from discovery.  Doc. 60, at 4.  In short, Defendant's concern is that "Plaintiff merely seeks information, which they [*sic*] believe can give them [*sic*] a competitive advantage."  Doc. 60, at 7; *see also id.* at 6 ("Plaintiff seeks to avoid the economic investment made by Defendant over 15 years (both in terms of time and money) in evaluating its product performance.").

Plaintiff responds that the SPO serves to alleviate all of Midsun's concerns. Doc. 68, at 13-16. The SPO allows either party to designate any of the following, without limitation, as "CONFIDENTIAL, ATTORNEYS' EYES ONLY":

> trade secrets, research and development information, customer lists, sales leads, sales, cost, and pricing information (whether actual or projected); or information within the definition of trade secret as set forth in Section 1(4) of the Uniform Trade Secret Act (1985)

Doc. 50 ¶ 4.  To make such a designation, the producing party need only "reasonably believe[] in good faith [that it] contain[s] or disclose[s] highly commercially sensitive, confidential or proprietary information."  *Id.*  Further, once produced, any such information "may be used solely for purposes of this litigation," and may only be disclosed in relevant part to outside counsel and experts.  Doc. 50 ¶ 8.  Those outside parties may only receive such information if they execute a confidentiality agreement attesting to their agreement to use the information "solely for purposes of this Litigation," and not to disclose any of such information.  Doc. 50 Ex. A.  Moreover, an outside party that has executed the confidentiality agreement may not receive any such material within ten days of

-7-

executing the agreement, during which time the party whose documents would be produced may file a motion with the Court to prevent the disclosure. *Id.* ¶ 9. If such a motion is filed, the information may not be disclosed until the motion has been resolved. *Id.* Additionally, any

> party aggrieved by a breach of the Protective Order may seek injunctive relief and/or enforcement by the Court's contempt power. Such party may also seek damages for any actual loss or for any unjust enrichment caused by such breach. If neither damages nor unjust enrichment is provable, an aggrieved party may request that the Court order payment of a reasonable royalty for a period of time during which the use of the information could have been prohibited as a penalty. The court will determine what relief, if any, may be awarded on account of any breach.

*Id.* ¶ 19. Finally, all such material must be destroyed or returned within sixty days of the termination of the litigation. *Id.* ¶ 22.

Defendant offers no explanation for how the SPO does not obviate its concerns. Nor does the Court see any. Defendant feebly (again) argues that allowing disclosure to experts is unacceptable because "any expert is so qualified because he has interests in the very technology that Plaintiff's [*sic* (note: not only the erroneous apostrophe, but the reference to the wrong party)] seek to protect as a trade secret," and that "[o]nce anyone has knowledge of the trade secret, Defendant will have lost control over its potential dissemination." Doc. 60, at 8. Not so. The SPO expressly limits experts' use and disclosure of the material, and allows Defendant to recover for any damages caused by a breach of that provision. As explained by the Second Circuit:

> The disclosure of confidential information on an 'attorneys' eyes only' basis is a routine feature of civil litigation involving trade secrets . . . . The purpose of this form of limited disclosure is to prevent a *party* from viewing the sensitive information while nevertheless allowing the party's *lawyers* to litigate on the basis of that information. . . .
>
> If a party in a commercial suit obtains a competitor's trade secrets, at worst the party will gain an unfair financial advantage over his

> competitor.  Though such an injury is serious, it involves money, not
> public safety, and it can usually be remedied by an injunction or
> money damages.

*In re The City of New York*, 607 F.3d 923, 935-36 (2d Cir. 2010).  Further, a Court should not lightly

assume that parties will violate their obligations imposed on them by a duly entered order on the

Court's docket.  As stated in *Hsqd, LLC v. Morinville*,

> In fact, both . . . proposed protective orders contain a provision that
> confidential information 'may be used exclusively for purposes of this
> litigation, subject to the restrictions of this [protective] order.' . . .
> [T]he Court . . . trusts that the parties will abide by this provision of
> the proposed protective order.  On the record before the Court, there
> is no evidence that [either party] cannot be trusted to maintain the
> confidentiality of documents disclosed for purposes of this litigation.

2013 WL 1149944, at *3 (D. Conn. Mar. 19, 2013) (rejecting even a second-tier "attorneys' eyes

only" designation because the first-tier was sufficient).  In light of the significantly strong protective

order in place in this case, Defendant has shown no reason to deviate from this usual course of

procedure.  Defendant's motion for a protective order prohibiting the disclosure of purported trade

secret material is denied.

### C.    Sanctions

> [If a motion for a protective order] is denied, the court . . . *must*, after
> giving an opportunity to be heard, require the movant . . . to pay the
> party . . . who opposed the motion its reasonable expenses incurred
> in opposing the motion, including attorney's fees.  But the court must
> not order this payment if the motion was substantially justified or
> other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5) (emphasis added).

At the outset, the Court notes that Defendant egregiously mischaracterizes the law applicable

to sanctions under Rule 37(a)(5).  It cites as applicable the standard from *Enmon v. Prospect Capital*

*Corp.*, 675 F.3d 138 (2012).  Doc. 69, at 8 ("It is clear from *Enmon*, that sanctions against Midsun

are not warranted").  *Enmon* involved the Court's inherent power, and its power under 28 U.S.C. § 1927, to sanction an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously."  As *Enmon* states, the district court must find "bad faith" to impose such sanctions. Sanctions under Rule 37(a)(5) are of an entirely different ilk.  Rule 37(a)(5) not only allows for, but requires, the imposition of sanctions against a movant whose discovery motion was not "substantially justified."  No bad faith showing is required.  *Enmon* is entirely inapposite.[4]

There is no doubt that Defendant's motion was not substantially justified and that sanctions are warranted pursuant to Rule 37(a)(5).  It was the Court's initial view that the SPO may have "obviate[d] the need" for Defendant's motion.  After review, it is clear that the SPO protects against the very concerns Defendant has as to production of its trade secrets.  Notably, Defendant proffered no explanation to the contrary, *despite* knowing the Court's initial view.  In other words, the SPO did, in fact, "obviate the need" for a motion as to trade secrets.  All that remains therefore is Defendant's relevance objection, which is entirely without merit for the reasons discussed above and was also unsupported by any authority.  And, the authority to which Defendant does refer—mostly in attempts to distinguish Plaintiff's on-point authority—was presented in a misleading fashion to the Court. Defendant's motion was not substantially justified.  The Court is required to impose sanctions for Defendant's filing of its renewed motion.[5]

If Plaintiff aims to recover for its costs and fees in responding to Defendant's renewed motion

---

[4]  Defendant's erroneous citation to *Enmon* is emblematic of its proffers of law to this Court, also demonstrated in its far-fetched motion for reconsideration, also resolved today.  It extends to Defendant's counsel the benefit of the doubt to refer to such examples as "sloppy lawyering."

[5]  For clarity, the Court is not imposing sanctions for expenses related to Defendant's earlier motion, which was filed prior to the entry of the SPO.

for a protective order, it will be required to file, on or before July 15, 2016, proof of its reasonable expenses and attorneys' fees in opposing the motion.  Plaintiff should submit documentation if its contemporaneous attorneys' records detailing the legal services provided in defending the instant motion, including "for each attorney, the date, the hours expended, and the nature of the work done." *New York Ass'n of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  The parties should keep in mind that the Court is required to conduct a "lodestar" analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 108 (2d Cir. 2014); *see also Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989) ("It is central to the awarding of attorney's fees . . . that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case.").  Defendant will be entitled to respond to Plaintiff's submission within fourteen (14) days of its filing, and may raise any arguments it wishes.

It is SO ORDERED.

Dated: New Haven, Connecticut
June 27, 2016

*/s/ Charles S. Haight, Jr.*
Charles S. Haight, Jr.
Senior United States District Judge

-11-