UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CSL SILICONES, INC., | |
| Plaintiff/Counterdefendant, | Civil Action No. |
| v. | 3:14-CV-1897 (CSH) |
| MIDSUN GROUP INC., | |
| Defendant/Counterclaimant. | DECEMBER 7, 2017 |

**RULING ON PLAINTIFF'S MOTION TO PRECLUDE
DEFENDANT'S PROPOSED EXPERT ON LIKELIHOOD OF CONFUSION [DOC. 166]**

**HAIGHT, Senior District Judge:**

This case involves allegations of trademark infringement. Plaintiff CSL Silicones, Inc. ("CSL") has moved to exclude the proposed testimony of Carl Fusco, a liability expert for Defendant Midsun Group Inc. ("Midsun"). Fusco was retained by Midsun to conduct a survey and to provide a report regarding market recognition and likelihood of confusion, issues central to this trademark dispute. This Ruling resolves the motion.

**I. BACKGROUND**

CSL brought this action against Midsun in connection with Midsun's alleged improper use of two of CSL's trademarks. CSL alleges that Midsun markets and sells silicone-based coating products under names similar to CSL's chosen names for its own silicone-based coating products, and thus Midsun is in violation of the federal Lanham Act, 15 U.S.C. § 1051 *et. seq*, and the Connecticut Unfair Trade Practices Act, ("CUTPA"), Conn. Gen. Stat. § 42-110. Midsun has alleged

1

various counterclaims against CSL pursuant to the Lanham Act and CUTPA. The Court previously granted Midsun's motion to dismiss CSL's causes of action, in part, dismissing Count II with prejudice as time-barred under CUTPA. Familiarity with the Court's Ruling is presumed. Cross-motions for partial summary judgment have been filed and will be the subject of a separate Ruling.

Relevant here, both parties develop and sell silicone-based coating products. One product – associated with the 570 mark for both parties – is used to coat and protect high voltage insulators, such as electrical power lines. *See* Compl. [Doc. 1] ¶ 7; Counterclaim [Doc. 84] ¶ 7. The other relevant product – associated with the 579 mark for both parties – is used to protect against corrosion of steel products, such as structural steel, bridges, machinery, and metal roofs, among other areas prone to corrosion. *See* Compl. ¶ 8, Counterclaim ¶ 8.

## II. PENDING MOTION

Pending before the Court is CSL's motion to preclude the testimony of Midsun's expert, Carl Fusco. CSL argues that Fusco is not qualified to offer the opinions he expresses in his expert report, and further contends that Fusco's opinions are unreliable as they are based on a flawed survey. Doc. 167 at 5. CSL argues that Fusco's opinions would not aid the trier of fact, and pose a danger of unfair prejudice to CSL that outweighs any probative value associated with his opinions. *Id.* Citing the seminal case on this subject, CSL urges the Court to "exercise its gatekeeping role" to preclude Midsun from relying on Fusco's opinions. *Id.,* citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 594-95 (1993).

Midsun, for its part, opposes CSL's motion, arguing, *inter alia*, that Fusco is qualified to testify regarding likelihood of confusion; his testimony is relevant and reliable; his methodology is sound; and the survey conducted "possesses sufficient circumstantial guarantees of trustworthiness."

2

Doc. 178 at 15.

### III. LEGAL STANDARD

**A.     Admissibility of Expert Testimony**

"The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995). *See also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 119 (2d Cir. 2006) (with respect to a district court's admission of expert testimony, the Second Circuit will "review a district court's evidentiary rulings under a deferential abuse of discretion standard, and will not disturb such rulings unless they are 'manifestly erroneous.'" (internal citations omitted)). The abuse of discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Pursuant to Rule 702, expert testimony is properly admitted where it "will help the trier of fact to understand the evidence or to determine a fact in issue;" "is based on sufficient facts or data;" "is the product of reliable principles and methods;" and where "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (quoting *Kumho Tire Co.*, 526 U.S. at 152). Thus, under the Federal Rules of Evidence, a court "must ensure" that an expert's testimony will be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The proponent of an expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *United States*

3

*v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert,* 509 U.S. at 593 n.10).

Finally, expert testimony, although deemed admissible pursuant to Rule 702, may be excluded under Federal Rule of Evidence 403. *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Pursuant to Rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Thus, "in acting as a gatekeeper, the court is responsible for 'keep[ing] unreliable and irrelevant information from the jury,' because of its 'inability to assist in factual determinations, its potential to create confusion, and its lack of probative value.'" *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 76–77 (N.D.N.Y. 2013) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11 Cir. 1999)).

**B.     Expert Qualifications**

Whether an expert is qualified is a threshold question that a court should address and resolve prior to engaging in a *Daubert* analysis. *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015)*; see also Nimely*, 414 F.3d at 396 (stating that whether a purported expert witness is qualified is a "threshold question"); *Zaremba v. Gen. Motors Corp*., 360 F.3d 355, 360 (2d Cir. 2004) (noting that a district court's *Daubert* analysis was "almost superfluous" in light of a purported expert's "meager qualifications"). Within the Second Circuit, courts have liberally construed expert qualification requirements. "Liberality and flexibility in evaluating qualifications should be the rule [and] the expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe v. American Honda Motor Co.*, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), *aff'd*, 101 F.3d 682 (2d Cir. 1996); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) ("The words

'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule[.]" (quoting Fed. R. Evid. 702)).

In general, the analysis requires the court to "examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702," and then to "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Washington*, 105 F. Supp. at 304 (quotation marks and citations omitted). One may become qualified as an expert based on practical experience, so that professional education is not a prerequisite. *United States v. Angelilli*, 660 F.2d 23, 39-40 (2d Cir. 1981), *cert. denied*, 455 U.S. 945 (1982). "Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) (collecting cases). "[O]f course, 'a district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient.'" *Krause*, 984 F. Supp. 2d at 74 (quoting *Stagl v. Delta*, 117 F.3d 76, 81 (2d Cir. 1997)).

## C. Reliability of Expert Testimony

If it is determined that a witness is qualified to testify as an expert, a trial court must assess whether the proposed testimony is reliable. To assess reliability, the Supreme Court has delineated a non-exhaustive list of factors a court may consider, including "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and if there are 'standards controlling the technique's operation'; and [w]hether the theory or technique

5

enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co.*, 526 U.S. at 149–50 (quoting *Daubert*, 509 U.S. at 592-94). This list of factors is "meant to be helpful, not definitive" and the aforementioned factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Id.* at 151; *see also E.E.O.C. v. Beauty Enterprises, Inc.,* 361 F. Supp. 2d 11, 20 (D. Conn. 2005).

> In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions. *See Daubert*, 509 U.S. at 595. . . . [W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks and citations omitted).

With this legal framework in mind, the Court turns to CSL's motion.

## IV. <u>DISCUSSION</u>

Midsun seeks to introduce the testimony and opinion of Carl Fusco as evidence that there is no market recognition of the 570 or 579 marks, and that there is no likelihood of confusion between Midsun's and CSL's marks. *See* Fusco Expert Report, Doc. 168-2 at 14. To arrive at this conclusion, Fusco designed and conducted a survey that was intended to include a sample of "engineers and operating professionals in the electric power transmission and distribution industries that had

6

responsibility for using, purchasing, specifying, or recommending products used to preserve and protect high voltage electrical utility and substation equipment." *Id.* at 4.

According to his expert report, Fusco requested and obtained a list of subscribers from a third party publication, Transmission & Distribution World, to compile the universe for the subject survey. Fusco requested that the publisher, Penton Media, identify and provide from its database a list of substation and distribution maintenance engineers involved with the "use, purchase, specification, or recommendation of high voltage insulator coating products used to preserve and protect high voltage electrical utility and substation equipment." *Id.* at 5. Penton Media identified such individuals from its subscriber base, and then provided a random sample of 5,000 records that served as the universe for the survey. *See id.* Fusco then compared this sample group with Midsun and CSL's customer lists, and determined that 18.2% of the sample frame matched Midsun's customer list, and 5.9% matched CSL's customer list. *Id.* at 6. Fusco then compared these matching percentages to Midsun and CSL's share of the market, indicated by a 1999 market study prepared by CSL. *Id.* After determining that each had a market share of less than 4%, Fusco opined that he had compiled a valid sample frame, and from this group Fusco selected a sample size of 150 individuals to interview for a telephonic survey. *Id.* at 6-7.

Fusco states that he modeled his survey design on the *Eveready* format, derived from its namesake case, *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied,* 429 U.S. 830 (1976). *Id.* at 7. Respondents were screened by certain questions that were meant to determine whether they were either currently responsible for – or had previous experience or responsibility with – using, purchasing, specifying, or recommending products used to preserve and protect high voltage electrical utility and substation equipment for their company or elsewhere. *Id.*

7

About halfway through the data collection process, Fusco observed that "the awareness of the sample for both '570' and '579' were low." *Id.* at 10. He then added an additional screening question to determine whether the respondents were aware of Midsun or CSL, and whether they had ever purchased a protective silicone coating product from either Midsun or CSL. *Id.*

Respondents were then asked, on an purportedly unaided basis, whether they could identify the company that "makes or puts out" either 570 or 579, "a silicone based material." *Id.* at 18, 20. Respondents were asked to explain the reason for their answers, and then were asked whether they believe there to be a business affiliation or connection between the company that makes or puts out the products in question and any other company. Respondents were also asked to explain their answers to this question. *Id.* at 18, 20. Respondents were provided the names of the two marks in question, and were asked whether they believed them to be made or distributed by the same company. *See id.* at 10 ("Are Midsun 570 and CSL 570, made or put out by the same company or made or put out by different companies?"). Finally, respondents were asked four identifying questions at the end of the survey "to help validate the respondent and industry." *Id.* at 11.

> Fusco's report indicates that the results of the survey showed that
>
> there is an extremely low awareness of what company makes or puts out a silicone based material utilizing either the trademark "570" or "579". Over 80% of the sample of engineers and operating professionals did not know what company was associated with these trademarks. No one mentioned CSL for either "570" or "579" and only 1% of the respondents associated "579" with Midsun.

*Id.* at 12. He found the results "not surprising," when one considers "the small market share that Midsun and CSL maintain." *Id.* The additional screening question, added halfway through the commission of the survey, indicated that "[m]ost of the respondents were not aware of either Midsun or CSL on an unaided basis; 4% were aware of Midsun and 1% were aware of CSL." *Id.* at 12. Fusco

8

concluded that "there is little awareness of the trademarks 570 and 579. Further, the data supports a finding that there is no evidence of confusion for the trademarks '570' and '579' as to whether they are related to the products the source of which is Midsun or CSL." *Id.* at 14. Thus, Fusco opined that there was no market recognition of either mark, and no likelihood of confusion between the subject marks. *Id.*

### A. Qualifications of the Proposed Expert

Fusco identifies himself as an "Accomplished Consumer Insights Executive and methodological authority[.]" Fusco *Curriculum Vitae,* ("C.V."), Doc. 168-2 at 24. He has over thirty years of experience in marketing research. He obtained an undergraduate degree from the State University of New York at Oneonta; a Master of Business Administration from the State University of New York at Albany; and a Master of Marketing Research from the University of Georgia. He has appeared and testified as an expert one time previously, in a New York State Supreme Court case.

CSL argues that Fusco's testimony should be excluded on the basis that he is not qualified as an expert on consumer confusion. CSL contends that Fusco has no education or experience that would qualify him as an expert in the relevant field, and also points to Fusco's deposition testimony whereby he himself appears to dissuade the notion that he is an expert on consumer confusion surveys. *See* Fusco Deposition, Doc. 167-1 at 8. In turn, Midsun argues that Fusco is "unquestionably" qualified to testify in this matter as an expert. Doc. 178 at 10. Midsun goes to lengths to recite Fusco's education and background in collecting and analyzing data, research in branding and trademarks; membership in several professional organizations; and direct employment experience in marketing and in survey research, design, and analysis.

At first glance, CSL's argument regarding Fusco's qualifications to opine as an expert on the

likelihood of confusion appears compelling. It is clear from a review of Fusco's list of experience, qualifications, and from his testimony that he has no prior experience in determining, surveying, or measuring the likelihood of confusion in the trademark context; nor does he have educational background on this particular topic. While Fusco has over thirty years of experience in marketing research, he appears to have no experience specific to federal trademark law. He has never testified as an expert in a Lanham Act case; he has never published on the topic of trademark studies or consumer confusion; and he has never previously reviewed, studied, designed or administered a survey to measure likelihood of confusion. Fusco's knowledge regarding likelihood of confusion surveys is derived from reading one book on the subject. Fusco considers himself an expert in marketing research and consumer satisfaction, but not an expert in surveying the likelihood of confusion. *See* Doc. 167-1 at 8. One may be pardoned a degree of skepticism when confronted by Fusco's unblushing self-evaluation that he is "very skilled" in this area, and that his skills derive from "some study," and from applying his expertise in methodology and research to the topic. *Id.*

However, the Court is guided by this Circuit's liberal standard of assessing an expert's qualifications, and by the governing principle that the expert "should not be required to satisfy an overly narrow test of his own qualifications." *Lappe*, 857 F. Supp. at 226. "Although an expert witness should not be permitted to stray beyond the 'reasonable confines' of his or her expertise to render an opinion on an entirely different field or discipline, a witness is not disqualified simply because he or she lacks specialized expertise that is narrowly tailored to the product or process at issue." *Coene v. 3M Co.*, No. 10-CV-6546, 2017 WL 1046749, at *7 (W.D.N.Y. Mar. 20, 2017) (internal citation omitted) (collecting cases); *see also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) (finding that the district court erred in requiring a high degree of specificity in

assessing a proposed expert's qualifications and thereby excluding the expert, where the "well-trained" expert in question had general qualifications not narrowly tailored to the facts of the case).

Fusco has over thirty years of both academic and practical experience in marketing research. He has designed and conducted numerous surveys and studies involving marketing and consumers.[1] Fusco testified that after studying the topic of confusion, he applied his extensive background in research technique and methodology to arrive at the subject survey and resultant conclusions. Fusco's vast experience in marketing research and with surveys are relevant qualifications. *See, e.g.*, *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-CV-8459, 2017 WL 3142072, at *4 (S.D.N.Y. July 24, 2017) (finding, over defendant's objections, that a proposed expert's experience "conducting qualitative and quantitative market research (including survey-based research) is a relevant qualification" for opining on the issue of genericness in a trademark infringement suit); *Bacardi & Co. v. New York Lighter Co.*, No. 97-CV-7140, 2000 WL 298915, at *6 (E.D.N.Y. Mar. 15, 2000) (determining that a proposed expert with training in social science research and a specialty in market research was qualified to testify as to likelihood of confusion in a trademark infringement matter).

Moreover, objections as to an expert's qualifications are generally considered in determining what weight, if any, to afford an expert; such disputes do not often warrant blanket exclusion of the

---

[1] Not much weight is given to Fusco's own statement that he is not an expert in surveying likelihood of confusion, as such a classification is a legal term, with which Fusco need not be familiar. *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 n.5 (S.D.N.Y. 2003) ("Nor does Prague's reluctance to categorize his opinions as 'expert' cause this Court to exclude his testimony. 'Expert' and 'lay' testimony are legal distinctions, of which no witness need be aware to qualify as an expert whose testimony is admissible.").

testimony. *See McCullock*, 61 F.3d at 1043 ("Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." (citing *Daubert*, 509 U.S. at 596)); *See also Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 459 (S.D.N.Y. 2007) (same); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (same).

For these reasons, the Court will not preclude Fusco from testifying on the basis of his qualifications.

**B.     Reliability and Relevance of Proposed Testimony**

Next, the Court must consider whether Fusco's proposed testimony is reliable, and relevant. CSL argues that the survey upon which Fusco bases his opinions was so defective as to render it unreliable and valueless; thus, Fusco's proposed testimony should be inadmissible. In *Kumho Tire Co.*, the Supreme Court made it clear that a *Daubert* gatekeeping evaluation, in addition to weighing the qualifications of the proffered expert, also must consider the reliability of the particular opinion the expert is called to express. "The relevant issue was whether the expert could reliably determine the cause of *this* tire's separation." 526 U.S. at 154.

CSL identifies two alleged flaws with the subject survey: one, that the wrong universe of individuals was surveyed; and two, that the survey failed to comply with the "well-accepted" standards for assessing likelihood of confusion in a trademark dispute. Midsun responds by arguing that the proper universe was surveyed, and that the design of the survey was appropriate. Midsun claims that the survey is reliable and that it "possesses sufficient circumstantial guarantees of trustworthiness." Doc. 178 at 15.

"The use of surveys is . . . far more prevalent in trademark law than in most other areas." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999), *as amended on reh'g* (Sept. 29,

1999). It is the "usual rule" in a trademark infringement matter that "a professionally conducted survey that relates to the facts in issue will be admitted into evidence, with any deficiencies or shortcomings serving to reduce the weight the survey is given." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") § 32:158 (5th ed. 2017); *see also Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) ("Generally, errors in methodology properly go to the weight of the survey evidence." (citations omitted)). However, a survey should be excluded where the methodology employed is so flawed that the errors render the survey not probative, unreliable, or unfairly prejudicial. *See Trouble*, 179 F. Supp. 2d at 307; *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 219 (S.D.N.Y. 2010) ("No survey is perfect and the limits and flaws of a survey generally go to evidentiary weight and do not warrant exclusion. Exclusion may be justified, however, where a single error or the cumulative errors are so serious that the survey is unreliable or insufficiently probative.").

There is no real dispute regarding the relevance of Fusco's opinion testimony and the subject study to the issues of the case. To prevail on a trademark infringement claim, "in addition to demonstrating that the plaintiff's mark is protected, the plaintiff must prove that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009) (collecting cases). Surveys that purport to measure likelihood of confusion are commonplace in trademark matters, and are routinely admitted as evidence for the purpose of demonstrating confusion in the relevant universe of consumers. The Court concludes that such testimony and evidence could assist the trier of fact and is therefore relevant. What remains to be determined, however, is whether the survey itself is so flawed as to render it and the accompanying

opinion testimony wholly unreliable, and therefore inadmissible.

"It is well established that 'a flawed universe minimizes the probative value of a survey and may lead to skewed results.'" *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp*., 97 F. Supp. 3d 485, 510 (S.D.N.Y. 2015) (quoting *Malletier v. Dooney & Bourke*, 525 F. Supp 2d 558, 630 (S.D.N.Y. 2007)). To be probative, a survey purporting to measure confusion must include in its universe potential consumers of the product in question. *See Trouble*, 179 F. Supp. 2d at 307; *see also McCarthy* § 32:159.

> A survey of the wrong "universe" will be of little probative value in litigation. But pursuant to the rule that technical deficiencies go to weight, not admissibility, if the universe is sufficiently close to an ideal, it may be admitted and accorded appropriate weight. . . . The Federal Judicial Center's 2011 Reference Manual on Scientific Evidence emphasizes that: "A survey that provides information about a wholly irrelevant population is itself irrelevant. Courts are likely to exclude the survey or accord it little weight."

*McCarthy* § 32:159 (footnotes omitted).

Here, as Midsun acknowledges, the universe for the subject survey was culled from a list of individuals identified as potentially responsible for using, purchasing, specifying or recommending "products used to preserve and protect high voltage electrical utility and substation equipment." Doc. 178 at 18. The survey itself included screening questions to further pinpoint such individuals. If the screening questions were successful in ferreting out the proper universe, it logically follows that the resulting sample group would (arguably) include potential purchasers of the parties' respective products adorned with the 570 mark. What does *not* logically follow, however, is that this group would include potential purchasers of the parties' respective products adorned with the 579 mark, which, as previously noted, are described as providing "protection against damaging corrosion in applications such as structural steel, bridges, machinery and equipment, tank exteriors, metal roofs

14

and other areas prone to heavy corrosion." Compl. ¶ 8, Counterclaim ¶ 8.

To this point, Midsun argues that the sample frame was not under-inclusive, as it was validated by a comparison of the lists of CSL and Midsun's actual purchasers of both their respective anti-corrosion product and high-voltage insulator coating product. This argument is of no moment. It is possible that there is a degree of overlap in consumers between the two types of silicone-coatings that the parties sell; some consumers may require silicone-coatings to protect both their high-voltage electrical equipment and also to protect against corrosion of their machinery. This does not change the fact that the survey's screening questions were targeted to obtain a relevant universe of potential purchasers of the products identified as 570, but not the products identified as 579.

Indeed, there is no sign from Fusco's expert report, deposition testimony, or Midsun's memorandum in opposition to the instant motion that the survey screened for the relevant potential consumers of the parties' respective products bearing the 579 mark. To the contrary, all indications are that Fusco was under the erroneous belief that both the products bearing the 570 mark and the 579 mark are applied in conjunction with high voltage electrical equipment. Fusco's responses to the questions posed to him at his deposition are particularly revealing:

> Q. So is it your understanding that Midsun used the term 579 in conjunction with sales of a product to be used with high voltage equipment?
> A. That is my understanding, yes.
> Q. And if, in fact, Midsun were to describe the product it sells associated with the 579 mark as something to be used in applications for structural steel, bridges, machinery and equipment, tank exteriors, metal roofs and other areas prone to heavy corrosion, would that change your understanding of how 579 was used by -- as associated with Midsun's products?
> A. It would change my understanding. But the only thing is we -- then we would not know if confusion existed in those markets, because we didn't study those markets.

Fusco Deposition at 96-7; Doc. 167-1 at 17.

Apparently unsatisfied to leave it at that, CSL's attorney returned to this line of questioning at the end of the deposition:

> Q. To the extent 579 products, products associated with 579 as used by Midsun or CSL Silicones, are used by, like, a water tank for example, to coat a water tank --
> A. Uh-huh.
> Q. -- would your survey have adequately captured the universe of person -- or captured the respondents who are involved in the purchase of products for such anti-corrosion sealants?
> A. I would say probably not because they -- the screener specified high voltage applications.

*Id.* at 120; Doc. 167-1 at 22.

The Court concludes that, as it pertains to the 579 mark, the survey was so flawed in its methodology that it is without probative value. The participants' responses to the questions posed are wholly irrelevant to the perceptions of the universe of potential consumers of the 579 products. The errors in selecting the universe of participants for the survey are sufficient to render the survey inadmissible as it pertains to any evidence of market recognition or likelihood of confusion as to the 579 mark. It therefore follows that any opinion testimony by Fusco regarding the 579 mark based on the results of this survey must be excluded.

CSL also advances arguments for excluding the Fusco's opinion testimony concerning the 570 mark. CSL maintains that Fusco erred in relying on the 1999 market study to corroborate the results of his survey, and that the survey screening questions were inadequately phrased. In support, CSL points to the low awareness rate of the survey participants as evidence that the incorrect universe was reached. The Court finds that these particular concerns are best addressed through cross-examination. *See Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 510 ("Defendants may well be right that the limitations of the Survey Experts' data about the people surveyed greatly decrease

the probative value of the surveys, but that concern is better dealt with through cross-examination, rather than exclusion."). The Court does not believe that there is a danger of unfair prejudice to CSL that is sufficient to outweigh the value of Fusco's testimony that would warrant exclusion of this testimony and evidence.

The same applies for CSL's perceived flaws in the design of the survey itself. These perceived errors do not warrant exclusion; rather, the sensible course of action is to admit the survey and Fusco's opinions other than for the purpose stated *supra*, and allow CSL to raise these arguments through cross-examination. That is in accord with the majority rule, that "while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence." *McCarthy*, § 32:170; *see also Boucher*, 73 F.3d at 21.

## V. CONCLUSION

For the foregoing reasons, CSL's *Motion to Exclude Defendant's Proposed Expert on Likelihood of Confusion* is GRANTED IN PART, specifically, as it pertains to excluding Fusco's opinion testimony and the survey evidence regarding market recognition and likelihood of confusion with the parties' respective 579 marks. The remainder of the subject survey and Fusco's opinion testimony will be admissible.

It is **SO ORDERED.**

Dated: New Haven, Connecticut
December 7, 2017

*/s/ Charles S. Haight, Jr.*
**CHARLES S. HAIGHT, JR.**
**Senior United States District Judge**