# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CSL SILICONES, INC.,<br><br>          Plaintiff/Counterdefendant,<br>v.<br><br>MIDSUN GROUP INC.,<br><br>          Defendant/Counterclaimant. | Civil Action No.<br>3:14-CV-1897 (CSH)<br><br>**MARCH 15, 2018** |

## OMNIBUS RULING ON SUMMARY JUDGMENT MOTIONS

**HAIGHT, Senior District Judge:**

Plaintiff CSL Silicones, Inc. ("CSL") brought this action against Defendant Midsun Group Inc. ("Midsun") in connection with Midsun's alleged improper use of CSL's trademarks. CSL alleges that Midsun markets and sells two silicone-based coating products under marks similar to CSL's chosen marks for its own silicone-based coating products. CSL brings claims for trademark infringement and unfair competition pursuant to the federal Lanham Act, 15 U.S.C. § 1051 *et seq.*, and claims pursuant to the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110. Midsun has brought counterclaims against CSL, alleging violations of the Lanham Act and CUTPA.[1] The Court has issued a number of rulings in this matter, familiarity with which is assumed.

The parties have filed cross-motions for partial summary judgment, pursuant to Rule 56 of

---

[1] The Court previously dismissed CSL's Count II, alleging violations of CUTPA, as time-barred. *See CSL Silicones Inc. v. Midsun Grp. Inc.*, 170 F. Supp. 3d 304, 314 (D. Conn. 2016), *reconsideration denied*, No. 3:14-CV-01897 (CSH), 2016 WL 3566188 (D. Conn. June 27, 2016). Following that Ruling, the parties stipulated to the dismissal of Count VII, the other claim CSL brought pursuant to CUTPA. *See* Doc. 154.

the Federal Rules of Civil Procedure. Four motions are pending; this Ruling resolves them.

## I.    BACKGROUND

The following facts are derived from the parties' submissions pursuant to Local Rule 56(a);[2] the uncontroverted deposition testimony; and the affidavits and exhibits attached to the parties' submissions. The facts recounted in this section are undisputed or indisputable.

CSL is a Canadian corporation with its principal place of business in Ontario, Canada. CSL's Local Rule 56(a)(1) Statement in Support of CSL Silicones Inc.'s Motion for Partial Summary

---

[2] Determining the undisputed factual background from the record was greatly complicated by Midsun's repeated failure to comply with Local Rule 56(a), which requires a party moving for summary judgment to provide, "in separately numbered paragraphs . . . a *concise* statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(1) (emphasis added). The two Local Rule 56(a)(1) Statements submitted by Midsun in support of its two motions for partial summary judgment fail to abide by this Rule. Each numbered assertion contains multiple sentences, paragraphs and subparts, and cannot in any way be described as "concise." Many of the facts stated are also immaterial to the motions. Further, Midsun's Local Rule 56(a)(2) Statements in response to CSL's motions for partial summary judgment contain paragraphs of extraneous information that have no discernible bearing on the facts they are purporting to be responsive to. For example, CSL submits that "CSL was founded in 1984 and is in the business of developing, promoting and selling silicone-based coatings for high voltage insulator, anti-corrosion, and anti-graffiti applications in industries such as electric power, petro-chemical, building & construction, transportation, and public infrastructure." Midsun denies this seemingly innocuous statement of fact with a entire page of argument and facts that appear non-responsive; this particular denial is then incorporated into all subsequent denials "as if fully set forth herein." *See* Doc. 183-1. "In this Circuit, a movant's failure to comply with a district court's relevant local rules on a motion for summary judgment permits, but does not require, a court to dispose of that motion." *Tross v. Ritz Carlton Hotel Co., LLC,* 928 F. Supp. 2d 498, 503 (D. Conn. 2013). Here, the Court will rule on the merits of each of the motions before it, but to the extent it is unable to determine the basis for any denial, where appropriate, it will deem such a fact admitted. *See Johnson v. Connecticut Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013) ("Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)(1) statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted."), *aff'd*, 588 F. App'x 71 (2d Cir. 2015).

Judgment, Doc. 171-1 ¶1. Midsun is a Connecticut corporation with its principal place of business in Southington, Connecticut. *Id.* ¶2. Founded in 1984, CSL develops and sells high-voltage silicone-based coatings for high voltage insulator, anti-corrosion, and anti-graffiti applications in certain industries. *Id.* ¶3. Midsun was founded in 1992, and started out as a distributor and applicator of other companies' coating systems for electrical applications. *Id.* ¶8, 10; Doc. 171-3 at 2. Initially, Midsun did not manufacture its own products. *Id.* ¶9.

In 1994, Midsun and CSL entered into a distribution agreement. *Id.* ¶11. The agreement stated that Midsun "wishes to establish an exclusive marketing arrangement with a manufacturer of high quality silicones." Doc. 171-3 at 2. The agreement further provided that "CSL has developed silicone coatings; 560, 570, 579 . . . for electrical applications hereafter referred to as the 'products'". *Id.* Under the agreement, CSL appointed Midsun to be the "exclusive agent for sales, distribution, marketing and application of products[.]" *Id.* Midsun agreed to "use its best efforts to promote the use of the 'products,'" including providing "advertising, publicity, direct sales and other marketing to cover all potential customers" in the relevant territories. *Id.* at 3. Midsun further agreed to "do nothing which would in any way damage the reputation of CSL or its products." *Id.* CSL agreed, *inter alia*, to permit Midsun to identify itself as the exclusive agent of the products and to publish Product Data Sheets, sales literature, and press releases. *Id.* Thus, under the agreement, Midsun would purchase products from CSL in Canada, and would resell the products to customers in the United States. Midsun's Local Rule 56(a)(1) Statement in Support of Midsun Group, Inc.'s Motion for Partial Summary Judgment on Plaintiff's Counts V and VI, Doc. 161-1 ¶9.

In 1995, CSL and Midsun entered into a second distribution agreement, entitled "Sales, Marketing & Distribution Agreement." Doc. 171-5. Under this agreement, Midsun was again

appointed as "the exclusive agent for sales and marketing of Products" in specific territories, in exchange for meeting a specified sales target. *Id.* at 2. CSL permitted Midsun "to advertise as the exclusive agent in the territories of the products . . . and warranty that the products meet their specifications." *Id.* Pursuant to this agreement, Midsun purchased CSL's products and resold the products in the United States and other locations. Doc. 161-1 ¶11. The agreement contained annual sales targets. Doc. 161-1 ¶14. While the agreements were in effect, Midsun distributed and sold CSL's high voltage insulator coating (the '570' product) and an anti-corrosion coating (the '579' product) in the United States. Doc. 171-4 at 37. The 1995 Agreement was terminated by CSL on January 4, 1999. Doc. 161-1 ¶8.

After the termination of the Agreements, Midsun began developing its own products. Midsun's Local Rule 56(a)(2) Statement, Doc. 183-1 ¶22; Deposition of Robert Vojtila, Doc. 171-4 at 11-12. Midsun purchased silicone material from CSL, blended it with other materials, and called that product '570.' Doc. 171-4 at 12. Midsun used the '570' number to designate its product because it was determined to be a "good idea" from a marketing and engineering standpoint, as Midsun had created a "personality" for the high voltage coating. *Id.* at 41; *see also* Deposition of Midsun's 30(b)(6) Representative, Doc. 171-14 at 18. Around the same time, Midsun began marketing and selling an anti-corrosion coating that it designated with the '579' number. Doc. 171-1 ¶¶26-7. Midsun did not have an internal chemistry department nor a chemist on staff, and it did not directly manufacture the silicone-coating products it sold. *Id.* ¶¶28-9.

Dr. Edward Cherney was the general manager and later the president and a director of CSL, from 1989 until he resigned from the company in 1999. Deposition of Faisal Huda, Doc. 171-22 at 10; Deposition of Edward Cherney, Doc. 171-7 at 43-4, 134; Doc. 175-1 ¶8. While employed by

CSL, he expressly gave permission to Midsun to relabel CSL's product as 'Midsun 570.' Deposition of Faisal Huda, Doc. 175-10 at 18. Cherney also had a test conducted to compare the performance of Midsun's '570' product to CSL's '570' product. Doc. 171-7 at 135-36. The testing was performed by a University of Waterloo student, at the University of Waterloo, where Cherney was also employed as a Research Professor. *Id.* at 136; Doc. 171-17 at 2. In a letter to Midsun, Cherney described the results of the test, stating that Midsun's '570' product was superior in performance. Doc. 171-1 ¶32; Doc. 171-17 at 2. Cherney was asked to resign from CSL because, in CSL's view, he was not acting in the best interests of the company. Doc. 175-10 at 17. Soon after his resignation, Cherney was hired by Midsun as a consultant. Doc. 171-4 at 56.

Between July 1999 and October 2000, CSL sent Midsun several letters. Doc. 171-18. The first letter, sent on July 15, 1999, noted that CSL had recently become aware that, without its knowledge or approval, Midsun had sold CSL's '570' product under the name 'Midsun 570.' Doc. 171-18 at 8. The letter stated that CSL would only continue to supply Midsun with CSL products if Midsun agreed to cease from repackaging CSL's products. *Id.*

On October 4, 1999, CSL sent another letter to Midsun, stating that CSL has "recently learned that Midsun is still selling CSL 570 HVIC under the name Midsun 570, despite [CSL's July 15, 1999, letter]." *Id.* at 7. CSL stated that Midsun's actions are "unethical and totally unacceptable and were carried out without the knowledge or consent of CSL[.]" *Id.* CSL demanded that Midsun cease and desist the sale of any CSL product in non-CSL packaging, and also directed Midsun to respond by a date certain. *Id.* On October 13, 1999, CSL wrote again to Midsun, noting that no response to its previous letter had been received, and terminating its direct supply relationship with Midsun. *Id.* at 6. The letter concluded by warning that "[a]ny future occurrences of Midsun Group

selling CSL product under the Midsun name will result in legal action by CSL[.]" *Id.*

On June 8, 2000, counsel for CSL sent a letter to Midsun, asserting that '570' and '579' were trademarks. *Id.* at 5. The letter stated that CSL had learned that during Midsun's term as CSL's authorized distributor, Midsun relabeled CSL's products with its own name, without CSL's knowledge or consent. *Id.* at 5. The letter further stated that CSL had become aware that Midsun was selling a product that had been manufactured for it under the name 'Midsun 570.' *Id.* at 5. The letter demanded that Midsun immediately "discontinue the use of the product designations MIDSUN 570, 579 or 587 or any other product designation or trade-mark confusingly similar to CSL's product designations and trade-marks including the trademarks 570, 579 and 587[.]" *Id.* at 5.

Midsun responded to this letter, stating that Midsun was "unaware that the numerals 570, 579 and 587 could be trademarked and in fact were trademarked as such. All CSL literature which we printed and which was approved by CSL never carried a 'tm' symbol indicating that they were anything other than just a numeral designation." Doc. 161-4 at 112. Midsun stated that it had been given consent to relabel and repackage all CSL products by Cherney. *Id.* The letter further represented that the former owner of CSL, Mr. Seraj Huda, had visited Midsun on three occasions in Connecticut and "was provided with literature denoting the labeling and the name Midsun 570" and that he did not stop Midsun from repackaging CSL's products. *Id.*

On September 28, 2000, counsel for CSL sent a letter to counsel for Midsun offering to "settle this matter" if Midsun "undertakes in writing to immediately discontinue the use of the product designations 570, 579, or 587 or any other designation or trademarks confusingly similar to CSL's product designations and trademarks including the trademarks 570, 579 and 587." *Id.* at 2. Midsun received each of these letters. Doc. 183-1 ¶¶35-9.

Midsun continues to market and sell a high voltage insulator coating product under the name '570' or 'Midsun 570.' *Id.* ¶43; Midsun's Answer to CSL's Complaint, Doc. 84 ¶14. Midsun marketed and sold an anti-corrosion product under the name '579,' 'Silprocoat 579,' or 'Midsun 579,' but has discontinued its marketing and sale of this product. Doc. 183-1 ¶44; Doc. 84 ¶15. At present, Midsun and CSL are competitors, and target the same companies for sale of the parties' competing products. Doc. 171-1 ¶68.

### A. '570'

On January 3, 2000, Midsun filed an intent to use trademark application for registration of the mark 'Midsun 570,' in connection with a "Room-Temperature Vulcanizing Silicon Rubber Coating Material for Application to Electrical Equipment for Protection Against Electrical Failure." Doc. 183-2 at 208; Midsun's Motion to Dismiss, Doc. 10-1 at 2. CSL filed a trademark application for '570' in Canada in April 2000, and in the United States in May 2000, which included labels that showed the terms 'CSL,' '570," and 'Si-Coat' within close proximity of each other. Doc. 164-1 ¶11; ¶21. An office action was issued by the United States Trademark and Patent Office ("PTO") to CSL in November 2000, citing the 'Midsun 570' application as a potential basis for refusal. *Id.* ¶23. Midsun filed an application in March 2001 for 'Midsun 570' based on a first use date of at least as early as February 14, 2001. *Id.* CSL's '570' application was suspended pending the disposition of the 'Midsun 570' application. *Id.*

In connection with Midsun's trademark application for 'Midsun 570,' in 2000, Midsun retained Ira Dorfman, a trademark attorney. Midsun's Local Rule 56(a)(1) Statement in Support of Midsun Group Inc.'s Motion for Partial Summary Judgment on Plaintiff's Count I, Doc. 164-1 ¶19. Dorfman prepared and filed Midsun's trademark application. Deposition of Ira Dorfman, Doc. 181-

24 at 12-13.

On November 13, 2001, Midsun was issued the registered trademark 'Midsun 570,' Registration No. 2508019. Doc. 164-3 at 93. CSL's application to register '570' was then refused. Doc. 164-1 ¶24. In December 2002, CSL filed a Petition to Cancel Midsun's registered trademark for the mark 'Midsun 570,' alleging, among other things, likelihood of confusion with CSL's use of '570' in commerce. Doc. 161-1 ¶22. Midsun filed two motions to dismiss; the first was rendered moot by the amendment of the petition and the second was denied. Doc. 181-24 at 39. On June 15, 2004, CSL withdrew its Amended Petition to Cancel the 'Midsun 570' trademark, and the Amended Petition was dismissed with prejudice on June 28, 2005. Doc. 161-1 ¶23. CSL withdrew its petition for financial reasons. Doc. 164-3 at 125.

Midsun's registration expired and was canceled on July 8, 2008, after Midsun did not file the appropriate materials to maintain the registration by the May 13, 2008, deadline. Doc. 181-24 at 38; Doc. 181-16 at 2. On October 19, 2012, Midsun filed a U.S. trademark application seeking to register the mark '570' for "silicone rubber coating material for application to electrical equipment for protection against electrical failure." Doc. 171-1 ¶46; Doc. 164-1 ¶28. On October 26, 2012, CSL filed a U.S. trademark application to register the mark '570' for "silicone based coating for application to electrical insulators." *Id.* ¶55. CSL's application provided a first use in commerce date of December 31, 1991. Doc. 1-1 at 2. The application stated that "570 is a secondary trademark of the application, which is used in conjunction with its Si-Coat mark." Doc. 164-1 ¶11. The PTO initially refused CSL's application on several grounds. Doc. 181-20 at 2. CSL's application was then suspended pending resolution of the instant lawsuit. Doc. 181-20.

In 2014, Midsun filed a U.S. trademark application seeking to register the mark 'Midsun 570'

for a "room-temperature vulcanizing silicone rubber coating material for application to electrical equipment for protection against electrical failure." *Id.* ¶47. Midsun does not own any trademark registrations for the 570 mark. Doc. 171-1 ¶57.

'570' does not relate to any inherent physical, chemical or other characteristic of room temperature vulcanizing silicone. Requests for Admission, Doc. 172-3 at 6. Nor does it have a publicly recognized meaning within the industry directed to coatings for electrical insulators other than as a source identifier. *Id.* The '570' mark used by Midsun is not famous. Doc. 171-1 ¶80. At the time that Midsun decided to name its product 'Midsun 570', it understood that there was a market for 'CSL 570.' Doc. 171-4 at 101.

Customers, or potential customers, have questioned Midsun about the similarities or differences between CSL's '570' product and Midsun's '570' product, and have asked Midsun if they are the same products. *Id.* at 7. CSL has produced sales data that show sales of its '570' product in the United States from February 2004 to present day. Doc. 164-1 ¶18. Midsun has consistently promoted and advertised the Midsun brand since at least 1999. Doc. 164-1 ¶29. CSL has promoted its '570' product since the early 1990's, and has referred to 'CSL 570' as a trademark since at least 1991 (in Canada) and 1992 (in the United States). Doc. 181-9; Doc. 181-12 at 8, 29.

**B. '579'**

Pursuant to Midsun and CSL's 1995 Agreement, Midsun used the numerals '579' in sales as early as November 1996. Doc. 161-1 ¶11. CSL would sometimes refer to the product identified as '579' as 'CSL-579,' or 'CSL 579.' Doc. 175-1 ¶11; Doc. 161-4 at 75-6, 83. Starting in 2000, CSL would often use 'Si-Coat' in conjunction with '579'. Doc. 161-1 ¶13. On April 5, 2000, CSL filed a trademark application with the PTO for '579,' a "silicone based corrosion protection coating for metal

surfaces," based on actual use in commerce. Doc. 161-1 ¶4; Doc. 171-1 ¶56. The application claimed a first use date of 1997, based on commerce between the United States and Canada. *Id.* Seraj Huda signed the '579' trademark application declaration on behalf of CSL. *Id.* On May 14, 2002, the mark '579' was registered under Registration Number 2,569,185. Doc. 161-1 ¶5(b); Doc. 171-1 ¶56.

On June 12, 2013, counsel for CSL sent a letter to counsel for Midsun regarding CSL's ownership of U.S. Trademark Registration No. 2,569,185, for the mark '579.' Doc. 161-4 at 120-21. The letter noted that Midsun appeared to be using the mark '579' in violation of CSL's rights in its own mark. *Id.* Following receipt of the letter, Midsun agreed to rename its '579' anti-corrosion product 'Midsun Silprocoat.' Doc. 161-1 ¶26.

On September 2, 2014, counsel for CSL signed a Declaration of Incontestability of a Mark, certifying that the '579' mark had "been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. Section 1062(c), and is still in use in commerce on or in connection with all goods/services listed in the existing registration." Doc. 161-1 ¶5(b).

Midsun does not own any trademark registrations for the '579' mark. Doc. 171-1 ¶57. '579' does not relate to any inherent physical, chemical or other characteristic of room temperature vulcanizing silicone. Doc. 172-3 at 6. Nor does it have a publicly recognized meaning within the industry directed to anticorrosion coatings, other than as a source identifier. *Id.*

CSL has produced sales data showing that sales of the '579' product took place in the United States from 2004 to 2016. Doc. 161-1 ¶6. CSL has not produced sales data for the '579' product in the United States between the date of registration and March 10, 2004. *Id.*

＊　＊　＊　＊　＊　＊　＊　＊　＊　＊　＊

This narrative of events reveals the deterioration of a once amicable and presumably mutually profitable business relationship into a welter of recriminations, claims, counterclaims, and energetic litigation. There are four pending motions. CSL has filed two motions for partial summary judgment: Doc. 170 and Doc. 120. These are separate motions which address different claims and counterclaims scattered throughout the pleadings. Midsun has filed two motions for partial summary judgment, Doc. 163 and Doc. 160, coupling the first of these with a motion for the taking of judicial notice on a particular point.

The Court will summarize the standard of review on motions and cross-motions for summary judgment, and will then consider these motions in that order.

## II.    STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must "demonstrate the absence of any material factual issue genuinely in dispute" to be entitled to summary judgment. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319-20 (2d Cir. 1975)) (quotation marks omitted).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by [Rule 56], the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a

genuine issue of material fact to be tried." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). The non-moving party cannot "defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Id.* (citations omitted). In other words, "[w]hen the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson*, 477 U.S. at 248). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quotation marks and citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

All inferences and ambiguities must be viewed in the light most favorable to the nonmoving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245-46 (2d Cir. 2015). The same standard applies where the Court is evaluating cross-motions for summary judgment. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." (citation omitted)).

"[W]hen both sides move for summary judgment, neither side is barred from asserting that

there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (citation omitted); *see also Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) ("The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief."). Instead, in evaluating cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981); *see also Omega S.A. v. Omega Eng'g, Inc.*, 396 F. Supp. 2d 166, 173 (D. Conn. 2005) ("When faced with cross-motions for summary judgment, the court must consider the evidence differently depending on which motion is being addressed."), *opinion adhered to on reconsideration*, No. 3:01-CV-2104(SRU), 2005 WL 3307277 (D. Conn. Dec. 6, 2005).

## III.    CSL's MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 170]

CSL seeks summary judgment on Counts I, V, and VI of its complaint. Counts I and VI allege claims of unfair competition under 15 U.S.C. § 1125(a) for Midsun's use of CSL's '570' mark and '579' mark, respectively. Count V alleges a claim of trademark infringement pursuant to 15 U.S.C. § 1114 for Midsun's use of CSL's '579' mark. CSL also moves for summary judgment on Midsun's counterclaims I through VI; Midsun's affirmative defenses; and on the issue of willful infringement. Finally, CSL requests that the Court award attorney's fees.

### A. Lanham Act Claims

Section 32 of the Lanham Act prohibits the unauthorized use in commerce "of any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Section 43(a) of the Lanham Act similarly prohibits the infringement of unregistered, common law trademarks. *See* 15 U.S.C. § 1125(a)(1); *see also Time, Inc. v. Petersen Pub. Co. L.L.C.,* 173 F.3d 113, 117 (2d Cir. 1999).

To succeed on a trademark infringement or an unfair competition claim under the Lanham Act, a plaintiff must prove that: (i) the plaintiff's mark is entitled to protection; and (ii) defendant's use of the allegedly infringing mark would likely cause confusion with the plaintiff's mark. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009); *see also Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012) ("[W]e analyze a trademark infringement claim in two stages, asking first whether the mark merits protection and, second, whether the allegedly infringing use of the mark (or a similar mark) is likely to cause consumer confusion." (quotation marks and citation omitted)). "Preliminary to making this showing, however, a plaintiff must demonstrate its own right to use the mark or dress in question." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007).

"The basic rule of trademark ownership in the United States is priority of use." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") § 16:1 (5th ed. 2017)); *see also ITC Ltd.*, 482 F.3d at 146 ("[T]rademark rights are acquired and maintained through use of a particular mark."). Ownership rights "develop when goods bearing the mark are placed in the

-14-

market and followed by continuous commercial utilization." *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (quotation marks and citation omitted).

Although trademark ownership rights accrue to the "first to use, not the first to register," 2 *McCarthy* § 16:18, the Lanham Act provides that registration of a mark is considered "prima facie evidence of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark[.]" 15 U.S.C. § 1115(a).[3] Moreover, a registered mark attains an incontestable status "if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993) (quotation marks and citations omitted). For an incontestable mark, "its registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce[.]" *Id.*

"To be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) (citation omitted). "There are five different categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful. The categories reflect both the eligibility for protection and the degree of protection accorded." *Lane Capital Mgmt., Inc.*, 192 F.3d at 344 (citation omitted). "A mark is entitled to protection when it is inherently distinctive; if the mark is 'merely descriptive,' it qualifies for protection only if it has acquired secondary meaning, i.e., if it 'has become distinctive of the . . . goods in commerce.'" *Time, Inc.*, 173 F.3d at 117 (quoting 15 U.S.C. § 1052(e)).

---

[3] The Act further provides that the registration shall also be prima facie evidence of "the validity of the registered mark and of the registration of the mark." 15 U.S.C. § 1115(a).

If a mark merits protection, the crucial issue becomes "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978). To determine whether there exists a likelihood of confusion, the Court applies the eight-factor balancing test introduced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), *cert. denied,* 368 U.S. 820, 82 (1961). The factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp.*, 588 F.3d at 115. "The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quotation marks and citation omitted), *cert. denied*, 137 S. Ct. 624 (2017). While no one factor is dispositive, and in some cases, a factor may be irrelevant to the facts before it, "it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995) (citation omitted).

With this guidance in mind, the Court turns the merits of CSL's motion.

### B. Ownership of the Marks

The initial dispute before the Court centers on whether CSL has ownership in the '570' and '579' marks, as established through priority and continuous use. CSL contends that the undisputed

evidence shows CSL's ownership in the '570' and '579' marks. For its part, Midsun argues that CSL cannot demonstrate its right to use the marks in question. The Court will consider whether CSL has established its ownership of each mark separately.

### 1. '570'

CSL contends that it is indisputable that it was the first to use the '570' mark in commerce in the United States, and argues that Midsun has admitted to CSL's priority in the mark through its witnesses' testimony. Midsun claims that CSL cannot establish priority in the '570' mark because, during the 1990's, CSL did not use '570' as a trademark; and that CSL cannot establish use of the mark in commerce prior to Midsun's own use of the mark. Midsun also contends that CSL cannot rely on the testimony and declaration of its president Faisal Huda to establish priority, as Huda has no firsthand knowledge of certain events that transpired during his absences from CSL. Finally, Midsun argues that the Court should determine which party has priority to the mark by consideration of the parties' previous manufacturer-distributor relationship, and analyze the factors discussed in *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96 (E.D.N.Y. 2012).

The first question to consider is whether CSL has established priority in the '570' mark as a matter of law. Under the Lanham Act, "use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. [A] mark shall be deemed to be in use in commerce on goods when it is placed in any manner on the goods . . . and the goods are sold or transported in commerce. . . ." 15 U.S.C. § 1127. "Adoption and a single use of the mark may be sufficient to entitle the user to register the mark." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974) (collecting cases). While evidence of mere advertising, without more, is inadequate to establish "use" within the meaning of

the Lanham Act, if the use is "calculated to consummate a sale," it can be sufficient. 3 *McCarthy* § 19:108.

"A court must determine whether a trademark has been used in commerce, on a case by case basis, considering the totality of the circumstances around the use of the mark." *Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 558 (E.D.N.Y. 2017) (quotation marks and citation omitted). *See also La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1274 n.11 (noting that "what constitutes sufficient use for trademark ownership purposes is obviously a case-by-case task").

Here, although there is no admissible evidence of actual sales made in the United States prior to the parties' distribution agreement, there is evidence that CSL offered, promoted, and sold its '570' product in the United States, prior to engaging in a business relationship with Midsun in 1994. CSL has established that its employees visited companies in the United States in 1990 in an effort to persuade them to purchase and apply the '570' product to electrical equipment. *See* December 1, 2016, Deposition of Edward Cherney, Doc. 180-5 at 60-3; Doc. 183-2 at 61-2; Doc. 171-7 at 45-6. Cherney's testimony also establishes that in 1990, CSL retained a distributor in the United States to sell its '570' product, Doc. 183-2 at 62, and that CSL sold the product to Midsun prior to the formation of their exclusive distributor relationship. *Id.* at 64-5.

Such evidence that CSL's '570' product was on the market prior to Midsun's engagement as exclusive distributor, coupled with CSL's clear intention at that time to continue to exploit its trademark commercially, as evidenced by the parties' 1994 Agreement, is sufficient to establish that CSL was the first to use the '570' mark in the United States. *Cf. Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 167–68 (2d Cir. 2016) (finding that defendant had raised a genuine issue of fact as to use in commerce where it offered evidence that it had a commercial website

featuring the mark and several stand-alone advertisements directing consumers to the website prior to plaintiff's use); *Marvel Comics Ltd. v. Defiant, a Div. of Enlightened Entm't Ltd.*, 837 F. Supp. 546, 549 (S.D.N.Y. 1993) (finding, on a motion to dismiss, the plaintiff adequately alleged commercial use that may be sufficient to establish its right to a mark where, without making sales, the plaintiff promoted and advertised the mark); *La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1272, 1275 (noting that in determining whether bona fide use exists, "[t]here must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade" and a "present plan of commercial exploitation" or "present intent . . . to market the trademarked product" may be considered in making such a determination (quotation marks and citation omitted)).

Midsun also argues that CSL did not use – or intend to use – '570' as a mark during the relevant time frame. Midsun's argument appears two-fold: One, that CSL failed to designate '570' as a trademark; and two, that CSL's use of 'CSL' in conjunction with '570' is evidence that '570', standing alone, was not a mark. Both arguments are without merit, and fail to raise a material issue of fact.

*First*, as discussed *supra*, trademark ownership rights are established through use of the mark in commerce. The use of a 'TM' symbol in connection with a mark, either registered or unregistered, is not statutorily required, and does not, by itself, establish trademark rights. *See* 3 *McCarthy* § 19:148 n.5 (collecting cases). Midsun does not point to a single court decision finding otherwise. CSL's failure to use the 'TM' symbol in literature, advertising, labels, or its agreements with Midsun is not determinative of whether CSL has ownership rights in '570'.[4]

*Second*, CSL's use of 'CSL' in connection with '570' is considered use of the mark, relevant

_____

[4] The Court's analysis applies on this point applies equally to '579' mark.

to determining priority. "A 'housemark' or 'house mark' is a trademark that identifies the business that produces the product." *Arrow Fastener Co.*, 59 F.3d at 388 n.1 (citation omitted); *see also* 4 *McCarthy,* § 23:43 ("A 'house mark' is a mark used on several different goods or services which themselves use a particular 'product mark.'"). The use of a house mark in connection with a trademark is common, and does not speak to the validity of the trademark of the product itself. *See* 1 *McCarthy* § 7:5 (explaining that "the mark KELLOGG may appear on a label along with POP-TARTS, but this does not per se detract from the trademark function of the product mark POP-TARTS"). "Whether or not a product mark always used with a house mark possesses a separate trademark significance depends upon the manner of use and the commercial impression engendered by that use." *Id.* In line with these principles, "use of house and product marks together does not constitute abandonment of each one individually." *BeautyBank, Inc. v. Harvey Prince, LLP*, No. 10-CV-00955(AJN), 2013 WL 11327097, at *9 (S.D.N.Y. Mar. 29, 2013) (citing *Bridgestone Americas Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 1336 (Fed. Cir. 2012)).

Here, in instances where 'CSL' appears next to '570', 'CSL' is the house mark and '570' is the product mark. Midsun does not cite to any authority for the proposition that CSL's use of its 'CSL' house mark in conjunction with the '570' trademark precludes or minimizes the individual "use" of the '570' mark. That is to say: Notwithstanding CSL's juxtaposition of its house mark 'CSL' with the trademark '570,' the use of the trademark may be considered individually for the purpose of establishing priority.

Midsun also argues that CSL's sales of the '570' product under the parties' exclusive distribution agreements were made in Canada, to Midsun, and thus do not constitute sales in the United States sufficient to establish "use in commerce." In effect, Midsun's argument is that the sales

that were performed in the United States through Midsun from 1994 until the termination of the parties' agreement in 1999 do not inure to CSL's benefit for the purposes of determining use of the '570' mark.

"[W]here two companies operate within a manufacturer-distributor arrangement, the 'exclusive U.S. distributor does not acquire ownership of a foreign manufacturer's mark any more than a wholesaler can acquire ownership of an American manufacturer's mark, merely through the sale and distribution of goods bearing the manufacturer's trademark.'" *Haggar Int'l Corp.*, 906 F. Supp. 2d at 110–11 (quoting 2 *McCarthy* § 29.02). Here, CSL has established that it was the first to use the '570' mark in commerce in the United States. While Midsun acquired an exclusive right to distribute CSL's products through the 1994 and 1995 Agreements, the Agreements did not confer trademark rights upon Midsun.

Midsun urges the Court to engage in a multi-factor analysis to determine priority of rights between a distributor and a manufacturer, citing to *Haggar Int'l Corp.*, 906 F. Supp. 2d at 96, in support. *Haggar* is a trademark infringement matter involving a foreign manufacturer and a domestic distributor. Following a bench trial, Magistrate Judge Pollack applied a test to determine which party had acquired ownership of the mark in question. *Id.* at 112-25. This analysis has been referred to as the "modified *Wrist-Rocket* test," *id.* at 112, so named for its application by the District of Nebraska in *Wrist-Rocket Mfg. Co. v. Saunders*, 379 F. Supp. 902, 913-14 (D. Neb. 1974) ("*Wrist-Rocket I*"), *aff'd in part, rev'd in part on other grounds*, 516 F.2d 846 (8th Cir. 1975) ("*Wrist-Rocket II*"), and its subsequent modification by the Ninth Circuit in *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1220 (9th Cir.)*, as modified,* 97 F.3d 1460 (9th Cir. 1996). As the Eighth Circuit made clear in *Wrist-Rocket II*, however, this analysis only applies to resolve the question of "who, as between

the manufacturer and distributor, has ownership of a trademark created *after* the formation of the business relationship," as opposed to "a case where a distributor appropriates to its own use an existing trademark of the manufacturer." *Wrist-Rocket Mfg. Co.*, 516 F.2d at 850 (emphasis added).

Here, it has been established that CSL was first to use the '570' mark in the United States, prior to any distribution agreement between the parties. Midsun has not raised a genuine issue of fact as to CSL's priority in the '570' mark. Thus, despite Midsun's contentions otherwise, the modified *Wrist-Rocket* test, as applied in *Haggar*, does not come into play. Midsun's sales of the products affixed with the '570' mark while the parties' distribution agreements were in effect are evidence of CSL's continuous use of the mark in the United States.

The parties also dispute whether CSL has demonstrated its continuous use of the '570' mark so as to establish ownership rights in the mark. "To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1271–72.

For evidence of continuous sales from 1999 to 2004,[5] CSL relies primarily on Faisal Huda's declaration that CSL's product "has been continuously marketed and sold in the United States in connection with the mark 570 from at least as early as 1994 and up to and including the present." Doc. 171-2 ¶3. Huda states that "CSL does not currently maintain records of its sales prior to February 28, 2002, or from the time period of January 31, 2003 - February 23, 2004, but CSL sold and offered for sale the 570 . . . product[] in the United States continuously from at least as early as 1994 to the present." *Id.* ¶10. Submitted in support of this declaration is a chart documenting

---

[5] It is undisputed that CSL continuously sold the '570' product in the United States from 2004 to present.

invoices and customers from 2004 onward, Doc. 171-20; and a sales history document that references sales of CSL's '570' product from February 2002 through January 2003, but is silent as to the location of the sales. Doc. 171-21.

Midsun argues that CSL has not produced records of sales for the period of time immediately following the termination of the parties' agreements, from January 1999 through March 2004. Midsun also posits that Huda has no personal knowledge of those matters which occurred prior to his employment with CSL, or those which occurred during Huda's "extended absences from CSL." Doc. 183 at 8. Midsun points to Huda's testimony that he attended college from 1993 to 1998, and was studying for his MBA in France during a portion of the relevant time period. Midsun raises this objection in its opposition, and also has specifically objected to certain parts of CSL's Local Rule 56(a)(1) Statement, where it relies in part or in full on Huda's declaration to support its factual assertions.[6]

---

[6] The Court feels compelled to comment on Midsun's argument as to Huda's knowledge, or, more accurately, his lack thereof. In support of its position, Midsun cites to Huda's deposition testimony, attached as Exhibit 33 to Midsun's opposition papers. However, the specific pages that Midsun references are not found at Exhibit 33. This omission prompted a thorough search of the entire record to determine whether the testimony Midsun cites appears elsewhere. Midsun does attach Huda's testimony twice more, to each of its two motions for partial summary judgment; but again, only selected pages. Only by cobbling together three separate excerpts of Huda's testimony was the Court able to find the entirety of the testimony that Midsun cites. Even then, Midsun's citations are startlingly rife with inaccuracies. Midsun states that Huda graduated from college at age 19, however, his testimony is clear that when he *commenced* his studies, he was 19. *See* Doc. 164-3 at 112. Midsun then claims that Huda worked "full time at Proctor & Gamble from August 1998 to August 2001." Doc. 183 at 8 (emphasis supplied). This is a material misrepresentation of Huda's testimony; Huda testified that after graduating college in 1998, he worked at Proctor & Gamble in "up until April 1999." Doc. 161-4. He started working at CSL "the next week," in April 1999. *Id.* Midsun then erroneously claims that Huda left for France to attend school in August 2000, Doc. 183 at 8, when in fact he testified – twice – that he was in France from August 2001 to January 2003, when he returned to Canada to rejoin CSL. Doc. 161-4 at 28, 30. Egregiously, Midsun repeats this inaccurate timeline in each of its Local Rule 56(a)(1) Statements (Docs. 161-1 ¶17, 164-1 ¶15); in its Local Rule 56(a)(2) Statement (Doc.

CSL responds that Midsun's "attempt to undermine CSL's evidence by challenging the personal knowledge of CSL's declarant, Faisal Huda, is a red herring." Doc. 195 at 10. Without directly addressing Midsun's central position that Huda lacks personal knowledge of the events that transpired at CSL in his absence, CSL contends that it has offered other evidence that supports its main arguments. CSL also argues that Huda's declaration can serve to lay the foundation for CSL's business records, regardless of whether Huda was present at the time the records were created.

Rule 56(c) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "An affiant's conclusions based on personal observations over time . . . may constitute personal knowledge, and an affiant may testify as to the contents of records []he reviewed in [his] official capacity." *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) (footnotes omitted).

Huda is President and CEO of CSL. Huda Declaration, Doc. 171-2 ¶1. CSL was founded by

183-1 ¶3, *passim*); and in the memoranda in law in support of its motions for partial summary judgment (Doc. 161 at 12, 34; Doc. 164 at 12, 16, 44). The Court previously had occasion to note that Midsun's submissions to the Court are "far from a model of clarity." Doc. 81 at 2. The Court has also discussed Midsun's mischaracterizations of the law, extending Midsun's counsel "the benefit of the doubt to refer to such examples as 'sloppy lawyering.'" *Id.* at 10. As discussed *infra*, this particular timeline important. Midsun apparently thinks so as well, as evidenced by the many times in the record that Midsun repeats its argument regarding Huda's absences from CSL, complete with the wrong dates. The Court concludes that such a misrepresentation of this particular chronology is at best another example of sloppy lawyering; at worst, it is an intentionally misleading representation to the Court. The Court reminds Midsun of its authority to impose sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, for "making false, misleading, improper, or frivolous representations to the court." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008) (citing Fed. R. Civ. P. 11). Any such representations in the future will likely result in the imposition of sanctions.

his father, *id.* ¶2, who passed away in March 2008. Doc. 164-3 at 25. Huda joined CSL in April 1999. Doc. 183-2 at 86. From 1999 to August 2001, Huda worked at CSL in a marketing position, Doc. 161-4 at 31, and "performed a sales support function." Doc. 180-14 at 4. In this capacity, in addition to performing marketing functions, he attended and delivered sales presentations in the United States. *Id.* Huda left the United States in August 2001 to attend graduate school; he returned in January 2003. Doc. 161-4 at 30. Upon his return, he rejoined CSL in a sales and marketing role. *Id.* Huda has worked at CSL ever since; he became General Manager in 2004, and took on the titles of President and CEO upon the death of his father in March 2008. *Id.* at 25.

Huda declares that the statements contained within his declaration are from his "personal knowledge or upon information and belief after having reviewed CSL's business records." Doc. 171-2 ¶1. Huda's testimony regarding his involvement in sales presentations in the United States from 1999 through 2001 does not speak to whether such presentations were for the '570' product, and CSL has not submitted any business records that conclusively establish sales of '570' in the United States from 1999 to 2004. Thus, the only admissible evidence before the Court to establish continuous use during this time is Huda's declaration. However, Midsun raises the factual issue that Huda was not at CSL from August 2001 to January 2003, calling into question his personal knowledge during that time. Midsun also points to Huda's conflicting testimony that he couldn't "claim to have full knowledge" of certain sales activity from 1999-2001, because he "wasn't focused on sales," he was "focused on marketing." Doc. 161-4 at 32.

Viewing the evidence in the manner most favorable to Midsun, the Court concludes that a genuine issue of fact exists as to whether CSL continuously used the '570' mark in commerce in the United States from 1999 to January 2003. Huda's conflicting testimony and his absence from CSL

during a time in which no other evidence of sales has been submitted is sufficient to raise a issue of material fact. A reasonable jury could determine that Huda's knowledge of CSL's sales of '570' does not extend to this time period, and that CSL cannot establish continuous use -- and thus ownership -- of the '570' mark. Accordingly, resolution of this issue is reserved for the trier of fact.

### 2. '579'

CSL owns an incontestable trademark for the '579' mark. As noted above, an incontestable registration is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). A mark gains incontestable status when it "has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce[.]" 15 U.S.C. § 1065 (including other conditions not at issue in this matter). CSL qualifies for that status, having achieved registration of the '579' mark in May 2002. Thus, CSL's incontestable registration for the '579' mark is conclusive evidence that CSL owns the mark and has an exclusive right to use the mark in commerce in the United States.

In opposition to CSL's motion for summary judgment, Midsun argues that CSL's registration for the '579' mark was obtained by fraud. The Lanham Act provides that one may defend a charge of infringement of an incontestable trademark by establishing that "the registration or the incontestable right to use the mark was obtained fraudulently." 15 U.S.C. § 1115(b)(1). "Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) (quotation marks and citation omitted). "A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by clear and

convincing evidence." *Orient Exp. Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988) (quotation marks and citation omitted). "To rise to the level of fraud, the false statement must be made knowingly and have been material to the PTO's decision to grant [the] trademark application." *Haggar Int'l Corp.*, 906 F. Supp. 2d at 127 (citation omitted).

Midsun's first claim of fraud is based on the first use date of 1997 in CSL's 2000 trademark application for the '579' mark. Midsun contends that the declaration of the date of first use was fraudulent, as there is no evidence of sales in the United States of the '579' product until March 10, 2004. Midsun claims that CSL's fraudulent intent to deceive the PTO "can be reasonably inferred" from "the evidence produced by CSL." Doc. 183 at 31. This argument is insufficient to establish, by clear and convincing evidence, that CSL committed fraud on the PTO. As an initial matter, there is admissible evidence in the record that CSL had sales of its '579' product in the United States prior to 1997, and Midsun offers no evidence to the contrary. Thus, the date of first use, as indicated on the '579' trademark application, does not appear to be inaccurate, let alone fraudulent.

Further, even assuming, *arguendo*, that the supplied date was inaccurate, Midsun has fallen far short of showing, by clear and convincing evidence, that such a representation was a deliberate material misrepresentation of fact. There has been no evidence submitted that would show that the first use date of 1997 had any bearing on the PTO's decision to grant the trademark application. *See Haggar Int'l Corp.*, 906 F. Supp. 2d at 127 (finding no clear and convincing evidence of fraud where there was no indication that an inaccurate date of first use was material to the PTO's decision to grant a trademark application, noting that an inaccurate dates "only becomes relevant and material if the []PTO had to determine which of two companies had the superior claim because of first use in United States commerce").

Midsun's second claim of fraud is based on CSL's Declaration of Incontestability, filed in 2014. Midsun argues that CSL's statement of continuous use was fraudulent, based on a lack of evidence of sales of the '579' product in the United States from 2002 to 2004.

Pursuant to the Code of Federal Regulations, the affidavit or declaration for acquiring incontestability for a mark registered under the Trademark Act must be "filed within one year after the expiration of *any* five-year period of continuous use following registration." 37 C.F.R. § 2.167(f) (emphasis added). *See also Trademark Man. of Exam. Proc.*, 1605.03, (5th ed. 2007) ("A §15 affidavit may not be filed until the federally registered mark has been in continuous use in commerce for at least five consecutive years after the date of registration. This may be any five-year period after the date of registration for marks registered under the Act of 1946. . . .The registrant may file the affidavit within one year after the five-year period that is selected."). As it is undisputed that CSL's '579' product was in continuous use from 2004 to present, there is no merit to Midsun's argument that CSL's Declaration of Incontestability in 2014 was fraudulent.

Thus, Midsun has not raised a material issue of fact to show that CSL obtained its '579' incontestable trademark registration through fraud. CSL's conclusive ownership in the '579' mark has therefore been established as a matter of law.

### C. Validity of the Marks

The parties also dispute the validity of the marks in question. As previously noted, "[t]o be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc., Inc.*, 192 F.3d at 344 (citation omitted). Thus, whether the marks are valid speaks to the question of whether the marks are entitled to protection. The Court will examine each mark in turn.

## 1. '570'

CSL argues that the '570' mark is an arbitrary mark, inherently distinctive and entitled to protection, as the number '570' is not descriptive or suggestive of silicone high voltage insulator coatings. Midsun contends that '570' is not inherently distinctive.[7]

> A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it describes, in the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

*Lane Capital Mgmt., Inc.*, 192 F.3d at 344 (citation omitted).

**"**Arbitrary marks consist of words that neither suggest nor describe any characteristic of the particular good or service with which it is used." *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 515 (S.D.N.Y. 1993) (citation omitted). CSL has submitted evidence that '570' is not descriptive or indicative of a silicone-based coating for high voltage insulators.[8] The evidence

---

[7] While Midsun does not advance this argument specifically as to the validity of the '570' mark, it does argue that '570' is not a strong mark because it is not inherently distinctive, in the context of the *Polaroid* factors. *See* Doc. 183 at 33-4. "The strength, or distinctiveness, of a mark is its power to identify the source of a product. In somewhat circular fashion, consideration of this factor includes an evaluation of the same characteristics that initially determined a mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning." *Time, Inc.*, 173 F.3d at 117. The Court will therefore address Midsun's argument as to strength in considering whether CSL has established the validity of 570 as a mark.

[8] In its Amended Responses to Certain of CSL Silicone Inc.'s First Request for Admissions, Doc. 172-3, Midsun admitted that "'570' does not relate to any inherent physical, chemical or other characteristic of room temperature vulcanizing silicone"; and that it "does not have a publicly recognized meaning within the industry directed to coatings for electrical insulators other than as a source identifier, whatever the source." Doc. 172-3 at 6. Rule 36 of the Federal Rules of Civil Procedure, which governs Requests for Admission, provides that a "matter admitted under this rule is conclusively established unless the court, on motion, permits the

shows that '570' does not pertain to a characteristic or quality of silicone coatings.

Midsun suggests that CSL's use of '570' is not inherently distinctive, because at one time, CSL used the mark as a model number or grade designator. Midsun suggests that the Court should "accord deference to the PTO's determination" in response to CSL's '570' trademark application that '570' is a grade designator.

Although "deference should be given by a court to the interpretation by the agency charged with its administration[,]" *Buti*, 139 F.3d at 105, the PTO examiner's initial rejection of CSL's '570' trademark application was not a final determination.[9] *See Therapy Prod., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009) (rejecting an argument that "significant weight" should be afforded to the PTO's determination to approve a registration for publication, "because the PTO's approval for publication is only a preliminary determination"), *aff'd in part, remanded in part sub nom on other grounds*, *Erchonia Corp. v. Bissoon*, 410 F. App'x 416 (2d Cir. 2011); *but see Arrow Fastener Co.*, 59 F.3d at 392–93 (according weight to the PTO's "initial conclusion" that the mark was a model designator, and to the decision "not to register the mark without evidence of secondary meaning").

Moreover, in this matter, Midsun has consistently taken a contrary position: That '570' *is* an inherently distinctive and therefore valid mark. *See, e.g.*, Midsun's Responses to CSL's First Request for Admissions, Doc. 172-3 at 6 (admitting that "'570' does not relate to any inherent physical,

_____

admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Midsun has not requested to withdraw or amend its response to these requests, and thus the Court deems such matters conclusively established.

[9] The proceedings before the PTO were suspended by this lawsuit, and thus, as to this issue, further arguments were not made, and a final determination was not reached.

chemical or other characteristic of room temperature vulcanizing silicone"; and that it "does not have a publicly recognized meaning within the industry directed to coatings for electrical insulators other than as a source identifier, whatever the source"); Midsun's 30(b)(6) Deposition of Robert Vojtila, Doc. 171-14 at 26 ("Q: The numbers 5-7-0 do not describe anything about the high voltage insulator coating other than who makes it; correct? A: Correct.").

In fact, Midsun itself has applied for trademark protection for the mark '570', and in connection with that application, submitted a declaration that "570 is arbitrary and has no significance in the chemical or coating industries or as applied to the goods and/or services except insofar as it has been used by applicant first . . . as part of the unregistered mark Midsun 570 and then as a registered mark." Midsun's Trademark Application for the '570' mark, Doc. 183-2 at 231-33. And in support of its own motion for summary judgment on Count I of CSL's Complaint, Midsun asks the Court to "accord deference to the PTO's determination [in connection with *Midsun's '570' application*] that '570' meets the substantive requirements for registration and award the registration to Midsun." Doc. 164 at 25. It is hard to reconcile this statement with the position now espoused by Midsun in opposition to CSL's motion for summary judgment.

Based on the evidence in the record and the admissions of the parties, the Court finds that CSL has established as a matter of law that '570' is an arbitrary mark, inherently distinctive and therefore valid and entitled to protection. *See Jordache Enterprises, Inc.,* 841 F. Supp. at 515-16 (determining that the '501' mark is arbitrary and fanciful as it "does not describe any particular quality or characteristic of jeans or jean apparel").

### 2. '579'

While Midsun claims that '579' is not inherently distinctive, it has already been established

that CSL owns an incontestable registration in the '579' mark, which is conclusive evidence of, *inter alia*, the validity of the registered mark. 15 U.S.C. § 1115(b). In arguing that '579' is not inherently distinctive, Midsun does not invoke any of the defenses that the Lanham Act provides for as a challenge to a mark's incontestable status. Accordingly, the Court finds that by virtue of CSL's ownership of an incontestable registration in the '579' mark, the mark is valid and CSL owns the exclusive right to use the '579' mark in the United States.

### D. Likelihood of Confusion

The Court addresses next whether CSL has shown that Midsun's use of the marks is likely to cause confusion within the public.[10] As discussed *supra*, this requires analysis of the *Polaroid* factors. "If a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996). With this guidance in mind, the Court turns to the *Polaroid* analysis.

### 1. Strength of the Marks

The first *Polaroid* factor, the strength of the marks, is defined as the "tendency to identify the goods as coming from a particular source." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir.

---

[10] Assuming CSL is able to establish ownership of the '570' mark at trial, a matter on which the Court expresses no opinion, it must still demonstrate that Midsun's use of the mark has created a likelihood of confusion. As noted *supra*, this analysis is required to determine whether CSL may recover on its Lanham Act claim for trademark infringement. The Court therefore engages in the *Polaroid* analysis as to both marks. *See RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 32 (D. Conn. 2009) (proceeding with the *Polaroid* factors to determine likelihood of confusion, even after finding an issue of fact as to the validity of the marks), *aff'd*, 410 F. App'x 362 (2d Cir. 2010).

1991) (quotation marks and citation omitted). "When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013) (citation omitted). The Court has already determined that '570' is an arbitrary, inherently distinctive mark. The evidence submitted supports the same conclusion for the '579' mark. Based on the marks' inherent distinctiveness, they are strong, because "[t]he law accords broad, muscular protection to marks that are arbitrary." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003).

However, the strength of a mark still depends in part on the mark's distinctiveness in the marketplace, known as its acquired distinctiveness. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998). CSL contends that its marks are commercially strong based on the evidence that the parties advertised, marketed and promoted the marks, and CSL continues to do so. Midsun points to evidence that, in connection denying CSL's trademark application for the '570' mark, the PTO cited other uses of '570', by other companies; Midsun contends that this weakens the strength of CSL's '570' mark. *See id.* (determining that while a mark was inherently distinct, it was not strong in its marketplace due to third-party use of the words constituting the mark). The parties do not dispute that the marks are not famous.

Viewing the evidence in the light most favorable to Midsun, as the Court must on CSL's motion, CSL has failed to show that this factor weighs in its favor as a matter of law. Thus, although the marks are somewhat strong based on their inherent distinctiveness, *see, e.g.*, *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 386 (2d Cir. 2005), there is not enough evidence to determine that the marks are strong. This factor therefore militates against a finding of likelihood of confusion.

## 2. Similarity of the Marks

The second *Polaroid* factor concerns the similarity of CSL's and Midsun's marks. "In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Pub.*, 991 F.2d at 1078 (citations omitted). "[S]ide by side comparison is not the appropriate test. Rather, the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone." *Akiro LLC*, 946 F. Supp. 2d at 334 (quotation marks and citation omitted).

Here, the marks are the same numbers. CSL uses the '570' mark in connection with its high voltage insulator coating product. Midsun uses '570' for its high voltage insulator coating product. CSL uses the '579' mark for its anti-corrosion coating product. Midsun uses '579' in connection with its anti-corrosion coating product. It is clear that the number marks are identical. Nevertheless, Midsun maintains that the marks are not confusingly similar because both companies use their house mark in conjunction with the trademarks at issue: 'CSL 570' or 'CSL Si-Coat 570' and 'Midsun 570'; and 'CSL 579' and 'Midsun 579.' "[T]he use of brand house marks is considered in the context of the specific facts to evaluate the marks' similarity, which is one factor among the totality of factors and contextual clues relevant to determining whether the marks' overall impression will cause confusion about the products' sources." *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12-CV-4112(AJP), 2014 WL 814532, at *14 (S.D.N.Y. Mar. 3, 2014) (quotation marks and citation omitted). *See also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) ("The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the

similarity of the two dresses.").

The Court concludes that the degree of similarity between the marks in question is a disputed factual issue to be resolved by the trier of fact. Viewing the evidence in a light most favorable to Midsun, a reasonable jury could determine that the marks are not confusingly similar due to the parties' use of their respective house marks in connection with the marks themselves. *See Jordache Enterprises, Inc*., 841 F. Supp. at 516 (finding the degree of similarity between two marks to be an issue of fact for the jury where the "extremely close" numeral trademarks were to be used in conjunction with a company name); *see also Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("Warner–Lambert's prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products." (collecting cases)); *Timex Corp. v. AAI. FosterGrant, Inc.*, No. 00-CV-295(CFD), 2000 WL 1576396, at *11 (D. Conn. Sept. 14, 2000) (finding that the presence of the parties' house marks on packaging, advertising and products "favors a finding that the two marks are sufficiently dissimilar" (collecting cases)), *aff'd*, 8 F. App'x 94 (2d Cir. 2001). Accordingly, this factor cannot be resolved as a matter of law.

### 3. Proximity of the Products

"This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582 (citation omitted). Here, it is undisputed that the products compete in the same markets and are in direct competition with each other. "Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity," which is a strong indication of

likelihood of confusion. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988). Accordingly, this factor weighs in favor of finding a likelihood of confusion.

### 4. Actual Confusion

The next *Polaroid* factor looks to whether consumers have actually been confused by the products that bear the allegedly confusing marks. While a finding of actual confusion would strongly militate in favor of a finding of likelihood of confusion, "[i]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act[.]" *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) (quotation marks and citation omitted).

As evidence of actual confusion, CSL submits an email sent by a "prospective customer" to CSL. Doc. 171 at 26. CSL contends that the customer "requested a quote for a Midsun product and thought CSL could facilitate the transaction due to confusion as to the source of the product." *Id.* Midsun contends that this email, when viewed in the context of the entire email chain, does not constitute evidence of actual confusion. Midsun also points to the survey its expert conducted as evidence that there is no actual confusion; and Midsun faults CSL for failing to commission its own survey.

Upon review of the entire correspondence leading up to the email upon which CSL relies for evidence of actual confusion, it becomes less apparent that the email evinces that which CSL contends. The email chain shows that CSL initiated the correspondence with the potential customer, LAPP Insulators, to inquire whether LAPP would consider purchasing CSL's product for a particular project. After initially expressing interest, LAPP then responded with regret, stating

> we already quoted coated insulators. Lapp USA has some experience with Midsun, they coated some post insulators for Lapp in the past. I regret for having to inform you about this. I gave your contact details to our colleagues so we can consider your company pertaining future opportunities.

Doc. 183-2 at 119-20 [sic]. The correspondence then continues, with CSL noting a perceived deficiency with the Midsun product, and the LAPP individual agreeing to meet to discuss. *Id.* at 118-19. It is therefore not clearly apparent that the email in question is evidence of actual confusion between the parties' products. Further, even if it was determined that this one email was evidence of actual confusion, "a single anecdote of confusion over the entire course of competition . . . constitutes *de minimis* evidence . . . ." *Savin Corp.*, 391 F.3d at 459 (quotation marks and citation omitted).

Finally, CSL's lack of survey evidence weighs against a finding of actual confusion. *See Nat. Organics, Inc. v. Nutraceutical Corp.*, 271 F. App'x 89, 90 (2d Cir. 2008) ("A trier of fact may still conclude that actual confusion exists in the absence of survey evidence, so long as there is other evidence of actual confusion, but the lack of survey evidence counts against finding actual confusion." (quotation marks and citations omitted)).[11] Accordingly, the Court finds no appreciable evidence of actual confusion in the record before it, weighing against a finding of likelihood of confusion.

### 5. Bridging the Gap

This factor "seeks to protect the senior user's interest in being able to enter a related field at some future time." *Jordache Enterprises, Inc.*, 841 F. Supp. at 517. As CSL and Midsun operate in the same market and compete for the same customers, there is no gap to bridge, and thus this factor

---

[11] The Court previously issued a Ruling that deemed Midsun's survey and expert opinion regarding confusion admissible evidence as it pertains to the '570' mark. The Court's Ruling also discussed potential flaws in the survey that might affect its probative value, and determined that such arguments were best raised on cross-examination. *See CSL Silicones, Inc. v. Midsun Grp. Inc.*, No. 3:14-CV-1897 (CSH), 2017 WL 6055380, at *8 (D. Conn. Dec. 7, 2017). Accordingly, the determination of what weight, if any, to afford this survey and its accompanying expert opinion will be reserved for the trier of fact.

weighs in favor of CSL. *See Connecticut Community Bank v. The Bank of Greenwich*, 578 F. Supp. 2d 405, 418 (D. Conn. 2008).

### 6. Good Faith

This next factor "examines whether defendant[] adopted [its] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [its] and plaintiff's product." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) (quotation marks, alterations and citation omitted). "Prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Arrow Fastener Co.*, 59 F.3d at 397 (citation omitted). Indeed, "the intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Nora Beverages, Inc. v. Perrier Grp. of Am.*, *Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (quotation marks and citations omitted); *see also George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir. 1992) ("There is an essential distinction between a deliberate attempt to deceive and a deliberate attempt to compete. Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a 'free ride' is permitted."). Thus, "the only relevant intent is intent to confuse." *Starbucks Corp.*, 588 F.3d at 117 (quotation marks and citation omitted).

CSL contends that Midsun acted in bad faith in adopting its '570' and '579' marks, as Midsun was aware of CSL's rights when it intentionally adopted said marks. CSL argues that the only reason Midsun has identified for choosing the marks was to trade upon the reputation that it had developed for the marks. CSL also argues that Midsun's ill intent is demonstrated by its declarations to the PTO in connection with seeking to obtain trademark registrations for 'Midsun 570' and for '570'. In further

support of its position, CSL points to evidence that it claims shows that Midsun misappropriated CSL's marketing and sales materials, and altered the dates and product names to promote its own competing products. CSL argues that this conduct is evidence of Midsun's intent to confuse consumers as to the source of its products, "to lead consumers to believe that nothing had changed, when in fact Midsun had stopped distributing and applying CSL's 570 product formulation and started selling its own." Doc. 171 at 34.

Midsun argues that it adopted the marks in connection with its corporate name; at that time, Midsun contends, CSL was not using the numbers as trademarks in the United States. Midsun also argues that CSL has not established the requisite intent, and points to evidence that it adopted its marks after CSL had authorized the relabeling of CSL's product to reflect Midsun's name. Midsun also argues that it reasonably relied on the advice of trademark counsel in adopting its '570' mark, and that its alteration of test reports does not establish the intent to promote Midsun's own product.

Here, it is undisputed that Midsun, CSL's former distributor, adopted the '570' and '579' marks with full knowledge of CSL's own use of the marks. What complicates this analysis is evidence that Midsun affixed its own name to CSL's product during the time the parties were working together to sell CSL's product pursuant to their distribution agreement. Both parties agree that Cherney, then employed by CSL, gave permission for Midsun to do so; however, the parties' accounts diverge on whether such permission was provided with the knowledge and approval of CSL, or if it was done by a rogue and traitorous employee, in breach of his fiduciary duties. The parties also dispute whether the distribution agreements were, in effect, a licensing agreement regarding the marks in question.

Drawing all inferences in favor of Midsun, it cannot be said that Midsun's first use of the

marks under the distribution agreements, in connection with CSL's product, was done in bad faith. And a reasonable jury may believe that upon the termination of CSL and Midsun's relationship, Midsun continued to use the marks in connection with its own products to capitalize on the reputation Midsun believed it had created in connection with its *own* name, rather than any reputation associated with CSL. A reasonable jury could also determine that Midsun did not intend to deceive consumers as to the source of its products. While there is hardly decisive proof of *good* faith on the part of Midsun – especially in light of the evidence tending to show that Midsun misappropriated test reports that had been conducted on CSL's product – the evidence is not conclusive that Midsun's intent was to deceive purchasers as to the source of its product, which is the relevant inquiry.

Drawing all inferences in Midsun's favor as the non-movant, the Court concludes that a genuine factual dispute exists as to whether Midsun acted in bad faith in adopting the trademarks at issue in this matter. *See The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996) ("Taken as a whole, the evidence does not conclusively point to a finding of either good or bad faith, and this issue, like many intent issues, is best left in the hands of the trier of fact."); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) ("[R]ecognizing that subjective issues such as good faith are singularly inappropriate for determination on summary judgment, we decline to hold as a matter of law that the defendants have acted in bad faith." (quotation marks and citation omitted)). This factor cannot be resolved as a matter of law, and is therefore reserved for the jury.

### 7. Quality of the Products

The next factor, the quality of Midsun's products,

is the subject of some confusion. Essentially, there are two issues with regard to quality, but only one has relevance to determining the likelihood of confusion. If the

quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, i.e., through dilution of the senior user's brand. A marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user. Conversely, where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution.

*Savin Corp.*, 391 F.3d at 460–61 (quotation marks and citations omitted). *See also Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875 (finding an increase in the likelihood of confusion as to source where the junior user's product was of good quality).

Here, CSL argues that Midsun has conceded that there are no significant differences in the quality of the parties' products. Midsun does not contest CSL's characterization of Midsun's position. Accordingly, the Court determines that this factor weighs in favor of a likelihood of confusion.

### 8. Sophistication of Relevant Consumers

This factor assesses the sophistication of the consumers of the products and the degree of discrimination they exercise when purchasing the products. "[T]he more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin Corp.*, 391 F.3d at 461. CSL contends that "at least some of the purchasers of the 570 and 579 products are not sophisticated." Doc. 171 at 25, and thus argues that confusion is likely. Midsun does not appear to contest this factor.[12]

There is minimal evidence in the record regarding the sophistication of the relevant consumers of each product. Testimony indicates that potential consumers have varied technical

---

[12] Midsun's papers do contain a subsection with the heading "Buyer Sophistication," *see* Doc. 183 at 38, but what is contained within that section sheds no light on Midsun's position on this *Polaroid* factor.

knowledge regarding the specifications of the products. *See* Doc. 171-14 at 6. It is clear to the Court that a consumer of such silicone-coating products must exercise *some* level of discernment. These goods are not available for purchase at a local hardware store. The sellers of these coating products solicit their customers, or the products must be specifically sought out for purchase from a supplier or from the manufacturer itself. The coatings then must be applied in a specialized manner. The parties market and advertise such products in trade magazines and at trade shows. In short, silicone coating products "are not the sort of products that are bought on impulse." *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 928 (S.D.N.Y. 1981). Accordingly, the Court finds that the consumers of such products are relatively sophisticated. *Cf. Tecnimed SRL*, 763 F. Supp. 2d at 409 (finding that thermometers are "common household products not marketed to consumers with any special expertise" and noting that such consumers are generally "not sophisticated" for the purposes of the *Polaroid* test (citations omitted)).

Here, as the relevant purchasers of the parties' silicone coating products are relatively sophisticated, CSL has not shown that this factor would weigh in favor of finding a likelihood of confusion.

### 9. Summary

Summary judgment as to likelihood of confusion is appropriate where "the undisputed evidence would lead only to one conclusion under the *Polaroid* test." *The Sports Auth., Inc.*, 89 F.3d at 960 (quotation marks and citation omitted). Here, although three of the *Polaroid* factors weigh in favor of a finding of likelihood of confusion, three factors weigh in favor of a finding of no likelihood of confusion, and there remain disputed issues of fact with respect to the similarity of the marks and Midsun's intent. Thus, the determination of whether there is a likelihood of confusion

-42-

cannot be determined as a matter of law on the present record, as the resolution of factual issues is required.

### E. Intentional and Willful Infringement and Attorney's Fees

CSL also requests that the Court find, as a matter of law, that Midsun's infringement is intentional and willful. Such a finding would affect the measure of damages and fees that CSL would be entitled to, if it prevailed in this litigation. *See Goodheart Clothing Co. v. Laura Goodman Enterprises, Inc.*, 962 F.2d 268, 272 (2d Cir. 1992) ("When bad faith infringement is shown, a district court is authorized to award attorney fees on the basis that an exceptional case has been established, and a district court that fails to consider awarding attorney fees when bad faith is established abuses its discretion." (quotation marks and citations omitted)). CSL thus argues that it is entitled to attorney's fees under the Lanham Act for Midsun's deliberate and willful infringement.

As the Court has determined that questions of fact exist, precluding summary judgment to CSL for its trademark infringement claim, including, *inter alia*, whether CSL can prove ownership of the '570' mark, and whether Midsun acted in good faith in its adoption of the 570 and 579 marks, summary judgment on the issue of willful infringement is not appropriate; and a determination of whether CSL is entitled to attorney's fees and damages is premature.

### F. Midsun's Equitable Defenses

CSL seeks summary judgment on Midsun's affirmative defenses.[13] CSL argues that Midsun

---

[13] CSL's motion specifically seeks summary judgment on Midsun's affirmative defense based on laches. *See* Doc. 171 at 36. In opposition to CSL's motion, Midsun addresses its three equitable defenses, arguing that each one serves to bar CSL's claims. In reply, CSL argues that all three defenses cannot be established and that judgment should be awarded as a matter of law. Accordingly, although CSL's motion for partial summary judgment addresses only laches, the Court will discuss each defense here.

cannot prevail on its defenses of laches, acquiescence or equitable estoppel due to Midsun's intentional infringement, or 'unclean hands,' and because Midsun cannot establish the necessary elements of each defense. For its part, Midsun argues that its defenses bar CSL's claims as a matter of law.

As an initial matter, the Court addresses CSL's contention that Midsun's 'unclean hands' bars invocation of its equitable defenses. It is well established that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). To be sure,

> [t]his maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. . . . Thus while equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

*Id.* at 814-15 (1945) (quotation marks and citations omitted). Thus, a court may deny relief based on the unclean hands doctrine "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (quotation marks and citation omitted).

In evaluating whether the unclean hands doctrine applies, "what is material is not that the [defendant's] hands are dirty, but that [it] dirtied them in acquiring the right [it] now asserts." *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F. Supp. 2d 430, 445 (S.D.N.Y. 1998) (quotation marks and citation omitted); *see also* 6 *McCarthy* § 31:51 ("Unclean hands must relate to the getting or using the alleged trademark rights." (footnote omitted)). "Because unclean hands is an equitable

defense, it can bar the assertion of another equitable defense, such as acquiescence and laches." *Id.* at § 31:44 (footnote omitted). "The burden of proving that unclean hands bars equitable relief is on the party asserting the defense." *Pedinol Pharmacal, Inc. v. Rising Pharm., Inc.*, 570 F. Supp. 2d 498, 505 (E.D.N.Y. 2008) (citation omitted).

Application of the unclean hands doctrine rests in the discretion of the court, which is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933).

In the context of a suit such as this, sounding in infringement,

> [i]t is well established that laches is not a defense . . . when the defendant intended the infringement. This good-faith component of the laches doctrine is part of the fundamental principle that he who comes into equity must come with clean hands. Thus, . . . intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense[.]

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (patent infringement case) (quotation marks and citations omitted).

Here, in viewing the record in a light most favorable to Midsun, the Court has already determined that material questions of fact exist as to whether Midsun intentionally infringed on CSL's marks. It follows that whether Midsun may maintain its equitable defenses, in light of its potentially dirty hands, is a question to be resolved another day. *See Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 273 (S.D.N.Y. 2002) ("[B]ecause a material issue of fact exists as to whether intentional infringement occurred . . . [Defendant] may not prevail on its equitable defenses in summary judgment, because it may not be permitted to raise them at all."). Accordingly, CSL may not prevail on summary judgment on Midsun's equitable defenses, based on the unclean hands doctrine.

However, CSL asserts other, independent grounds for summary judgment on Midsun's defenses. The Court will address each defense in turn.

### 1. Laches

"Laches is an equitable defense based on the maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who sleep on their rights). It bars a plaintiff's equitable claim where [it] is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (quotation marks and citations omitted). To prove a laches defense, a defendant must show that "[1] that plaintiff had knowledge of defendant's use of its marks, [2] that plaintiff inexcusably delayed in taking action with respect thereto, and [3] that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc'y, a div. of Merkos L'Inyonei Chinuch, Inc.*, 697 F. App'x 63, 64 (2d Cir. 2017) (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.3d 1037, 1040 (2d Cir. 1980)).

CSL contends that Midsun cannot prove the second element, that it has been prejudiced by any delay on behalf of CSL in bringing suit, and that CSL's actions in continually objecting to Midsun's use of the marks in question defeats any claim of prejudice. Midsun responds that has suffered both evidentiary prejudice and economic prejudice from CSL's delay in pursuing any rights to the marks.

"The burden of proving or rebutting the defense of laches is determined by reference to analogous state statutes of limitation." *RBC Nice Bearings, Inc.*, 410 F. App'x at 364 (quotation marks and citation omitted).

> When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the complaint or by his answer, that

> extraordinary circumstances exist which require the application of the doctrine of laches. On the other hand, when the suit is brought after the statutory time has elapsed, the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case.

*Leonick v. Jones & Laughlin Steel Corp*, 258 F.2d 48, 50 (2d Cir. 1958) (quotation marks and citation omitted). "Therefore, prior to the running of the most closely analogous state statute of limitations there is no presumption of laches and the burden remains on the defendant to prove the defense. Alternatively, once the analogous statute has run, a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996).

To determine which party has the burden of proof, the Court looks to Connecticut's three-year statute of limitations for fraud claims. *See CSL Silicones Inc.*, 170 F. Supp. 3d at 310; *see also RBC Nice Bearings, Inc.*, 410 F. App'x at 364–65 ("Connecticut's three-year statute of limitations for fraud determines which party has the burden of proving the applicability or inapplicability of the laches defense in this case."). CSL filed its complaint on December 17, 2014, thus the relevant date for the purposes of laches is December 17, 2011. It is undisputed that CSL was aware of Midsun's allegedly infringing conduct by 2000, when CSL wrote to Midsun to complain of Midsun's use of the marks in connection with Midsun's own product. It therefore follows that the presumption of laches applies in this matter, and the burden is on CSL to demonstrate its inapplicability to this case.

> There are two types of prejudice that may result from a plaintiff's delay in bringing suit.

> Evidentiary, or defense prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit. . . . The courts must look for a change in the economic position of the alleged infringer during the period of delay.

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) (quotation

marks and citations omitted), *abrogated on other grounds by SCA Hygiene Prod. Aktiebolag v. First*

*Quality Baby Prod., LLC,* 137 S. Ct. 954 (2017); *see also Metso Minerals, Inc. v. Powerscreen Int'l*

*Distribution Ltd.*, 833 F. Supp. 2d 321, 329 (E.D.N.Y. 2011) ("Evidentiary prejudice must consist

of some separate disadvantage resulting from the delay, such as loss of records, unavailability of

evidence, etc., that prevents a party from proving a separate claim or defense." (quotation marks and

citation omitted)).

In response to CSL's motion, Midsun strengthens the presumption of prejudice in its favor

by pointing to its marketing, advertising, and sales efforts of the marks in question over the years.

Further, Midsun claims that it has encountered difficulties in defending this suit in light of the death

of two individuals who would have had knowledge of the key issues relevant to this matter: The

founder of Midsun, Kevin Eldridge, and the founder of CSL, Seraj Huda.

As noted *supra*, "[b]ecause a presumption of prejudice is established in this case, it is

plaintiff's burden to make a showing that no prejudice will ensue." *Harley-Davidson, Inc. v.*

*O'Connell*, 13 F. Supp. 2d 271, 282 (N.D.N.Y. 1998). Indeed, "[w]hen seeking summary judgment

on the ground of laches, of course, a [party] must also show that there is no genuine issue of material

fact about the delay or prejudice that would require a trial." *Serdarevic v. Advanced Med. Optics,*

*Inc.*, No. 06-CV-7107(DLC), 2007 WL 2774177, at *6 (S.D.N.Y. Sept. 25, 2007) (addressing laches

in the context of a patent infringement claim), *aff'd*, 532 F.3d 1352 (Fed. Cir. 2008); *see*

*also Harley-Davidson, Inc.*, 13 F. Supp. 2d at 282 ("[T]he amount of prejudice required must be

considered in light of plaintiff's showing of excusable delay: An evaluation of prejudice is integrally

related to the inquiry regarding delay. Where there is no excuse for delay, defendants need show little

prejudice; a weak excuse for delay may, on the other hand, suffice to defeat a laches defense if no prejudice has been shown." (quotation marks and citation omitted)).

Here, CSL contends that the Court should reject any claim of prejudice, based on Midsun's awareness of CSL's continuing objections. "It is true that any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of plaintiff's objection to such acts." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). Thus, such a letter may serve to lessen the prejudice suffered. However, courts have also found that such a letter may lull a party into a "false sense of security" when the party threatening to file suit then fails to take action. *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*, No. 93-CV-1116(AJP), 1995 WL 465130, at *9 (S.D.N.Y. Aug. 7, 1995).

It is clear that CSL has failed to carry its burden on summary judgment as to Midsun's affirmative defense of laches; notably, a burden that it does not acknowledge it bears. CSL has not rebutted the presumption of prejudice and undue unreasonableness. Accordingly, CSL's motion for summary judgment on Midsun's defense of laches must be denied.

## 2. Equitable Estoppel

Equitable estoppel "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004). To prove equitable estoppel, Midsun must establish: "(1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice. Silence may in some cases be sufficient to establish a misrepresentation." *Id.* (citation omitted). Here, CSL contends that Midsun has not identified evidence to establish any element of this defense.

In opposition, Midsun makes no argument as to the '579' mark. It appears that Midsun has abandoned this defense by failing to oppose summary judgment in its opposition to CSL's motion.[14] Accordingly, CSL is entitled to summary judgment as to the affirmative defense of equitable estoppel regarding the '579' mark. *See Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 381 (S.D.N.Y. 2010) ("As a result of defendants' failure to oppose plaintiffs' motion as to their defenses the court finds that the defendants abandoned their affirmative defenses." (quotation marks and citation omitted)).

As to the '570' mark, Midsun contends that CSL's voluntary dismissal of its Petition to Cancel Midsun's 'Midsun 570' registration serves as a misrepresentation sufficient to establish estoppel. Midsun identifies the same economic and evidentiary prejudice that it discusses in relation to its laches defense.

The Court finds that Midsun has raised a triable issue of material fact as to whether CSL's withdrawal of its Petition to Cancel was a material representation upon which Midsun reasonably relied to its detriment. Although CSL argues that it never withdrew its objections to Midsun's use of the mark, CSL points to no evidence that Midsun was aware of CSL's continuing objection to the use of the mark from the time it withdrew its petition to the time CSL filed suit in this matter. Accordingly, CSL is not entitled to summary judgment on Midsun's equitable estoppel defense as to the '570' mark.

### 3. Acquiescence

---

[14] As further evidence of Midsun intent to abandonment of this defense as to the '579' mark, Midsun's motion for partial summary judgment on the claims related to the'579' mark is silent as to an equitable estoppel defense; in contrast, Midsun does move for summary judgment on that defense as to the '570' mark.

To establish a defense of acquiescence, defendant must prove that: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *ProFitness Physical Therapy Ctr.*, 314 F.3d at 67 (quotation marks and citation omitted). Acquiescence implies active consent, which can be shown by "conduct on the plaintiff's part that amounts to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant." *Id.* at 68.

CSL argues that Midsun cannot identify an active representation made by CSL to assure Midsun that it would not assert its trademark rights. Midsun does not identify any such representation in opposition to CSL's motion. Accordingly, CSL is entitled to summary judgment on Midsun's acquiescence affirmative defense.

### G. Midsun's Counterclaims

CSL also seeks summary judgment on Midsun's counterclaims for trademark infringement under the Lanham Act and CUTPA, illegal importation, and dilution. CSL argues that Midsun's counterclaims alleging trademark infringement fail because CSL has priority in the marks. CSL also argues that Midsun's CUTPA-based counterclaims are barred by the statute of limitations, as this Court has previously held that CUTPA claims sounding in trademark infringement do not accrue as to each use of a plaintiff's mark, and therefore a timely trademark-based CUTPA claim must be brought within three years of the first occurrence of the allegedly infringing conduct. *See CSL Silicones Inc.*, 170 F. Supp. 3d at 314. Midsun presents no arguments in opposition to CSL's motion for summary judgment in support of its counterclaims. Nevertheless, the Court will address the merits of CSL's arguments in favor of summary judgment.

### 1. Midsun's Counterclaims I-VI

Midsun's Counterclaims I-VI sound in trademark infringement. Counts I and III allege Lanham Act claims for unfair competition for use of the '570' mark and the '579' mark, respectively. Counts II and IV allege violations of CUTPA for use of the '570' mark and the '579' mark, respectively. Count V alleges a claim of illegal importation for the '570' mark. Count VI alleges a claim of federal trademark dilution for the '570' mark.

As discussed *supra,* CSL has established ownership of the '579' mark, and Midsun has failed to raise a triable issue of fact in this regard. Accordingly, Counts III and IV of Midsun's counterclaims fail as a matter of law, and summary judgment in CSL's favor on those counts is warranted.

Further, the Court has previously determined that a CUTPA claim must be brought within three years of the first occurrence of the allegedly infringing conduct. Here, in regards to Count II and IV, the allegedly infringing conduct – CSL's sales of products marked with '570' and '579' – commenced in the United States, according to Midsun, on or about 2004. Accordingly, any CUTPA claim would have had to be brought within three years of that first conduct. Midsun's counterclaims were filed on July 25, 2016. Doc. 84. Accordingly, Midsun's CUTPA-based counterclaims fail as a matter of law, as they are time-barred.

CSL also seeks summary judgment on Midsun's counterclaim alleging trademark dilution of the '570' mark, pursuant to the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c). The FTDA provides that "the owner of a famous mark . . . shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by

tarnishment of the famous mark . . . ." 15 U.S.C. § 1125(c)(1). A mark is considered famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* at (c)(2)(A).

In its Local 56(a)(1) Statement, CSL asserts that it is a fact that the '570' mark used by Midsun is "not famous." Doc. 171-1 ¶80. Midsun expressly admits this fact, *see* Doc. 183-1 ¶80, and does not point to any admissible evidence that would raise a triable issue of fact . As the mark used by Midsun is not famous, Midsun may not prevail on a claim for trademark dilution pursuant to the FTDA. Accordingly, CSL is entitled to summary judgment on Count VI.

However, the Court has determined that an issue of fact exists as to whether CSL owns the '570' mark. CSL's arguments for summary judgment as to Midsun's remaining counterclaims for unfair competition and illegal importation are premised on the assumption that CSL had ownership rights in the '570' mark as a matter of law. CSL has not shown the absence of material issues of fact as to these claims, and thus summary judgment is denied as to Counts I and V of Midsun's counterclaims.

### H. Conclusion

Accordingly, CSL's *Motion for Partial Summary Judgment* [Doc. 170] is GRANTED, in part, and DENIED, in part. CSL has proven, as a matter of law, that it is the owner of a valid, protectable trademark in the '579' mark. A triable issue of fact exists as to whether CSL has used the '570' mark continuously so as to establish ownership of the mark. Triable issues of fact also exist as to whether a likelihood of confusion exists as to Midsun's use of the '570' and '579' marks; specifically, whether Midsun's marks are confusingly similar, and whether Midsun adopted the marks in good faith. CSL has shown entitlement to summary judgment on Counts II, III, IV and VI of Midsun's counterclaims,

and summary judgment is denied as to Counts I and V. Triable issues of fact preclude summary judgment on Midsun's affirmative defenses of laches and equitable estoppel. Finally, triable issues of fact exist on the issue of willful infringement, and CSL's motion for an award of attorney's fees is DENIED without prejudice to renewal.

## IV.    CSL'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 120]

CSL separately moves for partial summary judgment on Counts VII, VIII, and IX of Midsun's counterclaims. Counts VII and VIII allege CUTPA violations for commercial disparagement and corporate defamation. Count IX alleges a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false advertising.[15]

### A. Count IX: Lanham Act False Advertising

Section 43(a) of the Lanham Act provides that

> [a]ny person who . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). Thus, to be actionable under the Lanham Act, Midsun must show that defamatory statements were made by CSL in "commercial advertising or promotion." *Id.*

[T]he touchstone of whether a defendant's actions may be considered 'commercial

---

[15] While it is not immediately apparent from the face of CSL's initial moving papers that summary judgment was sought on this Count, *see* Doc. 121, CSL clarifies in its sur-reply that its motion does seek summary judgment on all of Midsun's counterclaims premised on claims of defamation and disparagement, including Midsun's counterclaim for false advertising pursuant to the Lanham Act. *See* Doc. 158 at 7-8. Midsun's sur-reply requests that the Court strike that portion of CSL's reply that raises arguments as to this claim. CSL's later-filed motion for partial summary judgment (Doc. 170) states that the initial motion did request summary judgment on this counterclaim, and this issue was not raised during oral argument. The Court therefore construes CSL's initial motion for partial summary judgment as raising an argument for summary judgment on this counterclaim.

advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action.

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002); *see also*

*Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC,* 30 F. Supp. 3d 117, 134 (D.

Conn. 2014). Here, the statements that Midsun points to as defamatory or disparaging, discussed

further below, are unmistakably isolated in nature. There is no "proof of widespread dissemination,"

as is required to maintain a claim for false advertising under the Lanham Act. Accordingly, CSL's

motion for summary judgment on Count IX of Midsun's counterclaims is granted.

### B. Counts VII and VIII: CUTPA Disparagement and Defamation

Under Connecticut law, "to establish a prima facie case of defamation, the plaintiff must

demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement

identified the plaintiff to a third person; (3) the defamatory statement was published to a third

person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v.*

*Smolinski*, 319 Conn. 394, 430 (2015) (quotation marks and citation omitted). "Essentially, in order

to state a claim for defamation, a plaintiff must allege that a defendant published false statements

that harmed the plaintiff when the defendant was not otherwise privileged by law to do so." *Devone*

*v. Finley*, No. 3:13-CV-00377(CSH), 2014 WL 1153773, at *7 (D. Conn. Mar. 20, 2014); *see also*

*Cweklinsky v. Mobil Chem. Co.*, 297 F.3d 154, 159 (2d Cir. 2002) ("To establish a defamation claim

under Connecticut law, a plaintiff must prove that the defendant published unprivileged false

statements that harmed the plaintiff." (citing *Torosyan v. Boehringer Ingelheim Pharms. Inc.*, 234

Conn. 1, 27 (1995))). "Each statement furnishes a separate cause of action and requires proof of each

of the elements for defamation." *Gleason*, 319 Conn. at 431. "It is for the Court to decide whether the defendant's statements were capable of bearing a defamatory meaning, and it is for a jury to decide if the defendant's statements were, in fact, so understood by its recipients." *Devone*, 2014 WL 1153773, at *8 (emphasis omitted) (citation omitted).

A claim for commercial disparagement is "akin to the torts of injurious falsehood and slander of title." *Valtec Int'l, Inc. v. Allied Signal Aerospace Co.*, No. 3:93-CV-01171(WWE), 1997 WL 288627, at *6 (D. Conn. Mar. 7, 1997) (citations omitted); *see also QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 358 (2001) ("Defamation or disparagement of a business' goods and services may be considered trade libel; and is recognized by Connecticut . . . as a species of defamation." (citations omitted)); *Humble Surgical Hosp., LLC v. Aetna Life Ins. Co.*, No. 3:13-CV-01903(VLB), 2014 WL 12768253, at *5 (D. Conn. Sept. 30, 2014) ("The term 'trade libel' has . . . been applied to cases involving the disparagement of the quality, utility or value of another's products or services." (citations omitted)).

"To prove these torts, and thus to prove commercial disparagement, a plaintiff must demonstrate that the defendant made false representations." *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 3:06-CV-1710(VLB), 2010 WL 669870, at *24 (D. Conn. Feb. 19, 2010) (citation omitted). Like defamation, commercial disparagement requires "that the alleged damaging statement be made concerning the plaintiff." *Id.* at 359 (citations omitted).

CUTPA prohibits any person from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The statute defines 'trade' and 'commerce' as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or

intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."

*Id.* at § 42-110a(4). A plaintiff may sue pursuant to CUTPA "for claims that might otherwise be available in tort, or that are at least similar to common law torts," *Brown v. Rawlings Fin. Servs., LLC*, 868 F.3d 126, 131–32 (2d Cir. 2017) (citing Conn. Gen. Stat § 38a-816), a category within which defamation falls. To prevail its CUTPA-based counterclaims, Midsun must prove that: "(1) [CSL] engaged in 'unfair or deceptive' acts or practices in the conduct of trade or commerce, and that (2) [Midsun] has suffered an 'ascertainable loss of money or property.'" *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, No. 07-CV-0194 (TLM), 2011 WL 13228167, at *12 (D. Conn. Jan. 19, 2011) (citations omitted).

> It is well settled that in determining whether a practice violates CUTPA [the Supreme Court of Connecticut has] adopted the criteria set out in the cigarette rule by the Federal Trade Commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons. All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Thus a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. In order to enforce this prohibition, CUTPA provides a private cause of action to any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a prohibited method, act or practice.

*Ulbrich v. Groth*, 310 Conn. 375, 409–10 (2013) (quotation marks, citation and alterations omitted).[16]

---

[16] Conn. Gen. Stat. § 42-110b(b) provides in relevant part that "the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended."

CSL alleges that Midsun failed to identify any allegedly disparaging or defamatory statements that were spoken by CSL within the statute of limitations period applicable to CUTPA claims. In its opposition and again in its sur-reply, Midsun presents a number of statements that it contends are sufficient to raise genuine issues of fact to defeat CSL's motion for partial summary judgment. The Court will examine each statement in turn.

### 1. 2002 "Sun West" Fax

In response to an interrogatory requesting the factual basis for Midsun's defamation-based CUTPA counterclaims, Midsun identified a communication dated July 12, 2002, from CSL's former Executive Vice President John Barr to the Sun West Sales Company. Doc. 121-1 ¶5; Doc. 122-3 at 2. In this letter, transmitted by facsimile, Barr makes several statements regarding the quality of Midsun's '570' product, noting that it is "totally different from and inferior to" CSL's '570' product; that an independent analysis of its constitution reveals that it contains no aluminum trihydrate, and that "[i]n fact, the product is simply a rubber coating similar to a basic roof coating material." Doc. 122-3 at 2.

CSL argues that the statements in this fax do not establish a CUTPA violation as a matter of law, as they are outside the three-year statute of limitations period for CUTPA claims. In reply, CSL further argues that it is "far from clear that the statements in that fax are untrue, which would eliminate it from serving as evidence of defamation or disparagement." Doc. 135 at 6. In opposition, Midsun argues that this communication "establishes a recurring theme in CSL's long term campaign to discredit and damage Midsun and its products." Doc. 128-1 at 17. Implicitly acknowledging that a 2002 communication would be time-barred under CUTPA, Midsun instead contends that CSL's

allegedly defamatory statements were part of a continuing course of conduct, which would serve to toll the statute of limitations until such time as the wrongful conduct is completed.

As discussed *supra*, CUTPA provides that a claim "may not be brought more than three years after the occurrence of a violation of th[e] chapter." Conn. Gen. Stat. § 42-110g(f). And as this Court has now had multiple occasions to discuss in this matter, CUTPA is an "occurrence" statute, such that the limitations period accrues at the time the violative conduct occurs, "rather than upon the manifestation of the concomitant harm from that conduct." *CSL Silicones Inc.,* 170 F. Supp. 3d at 310 (citing *Finchera v. Mine Hill Corp.*, 207 Conn. 204, 212-13 (1988)). In line with these principles, a defamation-based CUTPA claim premised on any statement made in the Sun West correspondence would have had to be brought within three years of July 12, 2002, to be timely under CUTPA. As Midsun's CUTPA counterclaims based on defamation and corporate disparagement were asserted on July 25, 2016, to the extent the counterclaims are based on the Sun West letter dated July 2002, they are time-barred.[17]

Further, Midsun's "continuing wrongful course of conduct" theory cannot serve to toll the statute of limitations in this instance. The Connecticut Supreme Court "has recognized that under certain circumstances, the [CUTPA three year] limitations period may be tolled under the continuing course of conduct doctrine." *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 177 (D. Conn. 2000) (citation omitted).

In order to support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in

---

[17] Had Midsun brought a common law claim of defamation against CSL, any statement in the Sun West correspondence would also be time-barred, pursuant to Conn. Gen. Stat. § 52-597, which provides that "[n]o action for libel or slander shall be brought but within two years from the date of the act complained of."

existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such wrong. Where [the Connecticut Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. Thus, there must be a determination that a duty existed and then a subsequent determination of whether that duty is continuing.

*Stuart v. Snyder*, 125 Conn. App. 506, 510–11 (2010) (quotation marks and citations omitted).

"The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Bartold v. Wells Fargo Bank, N.A.*, No. 14-CV-00865(VAB), 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015) (quotation marks and citation omitted). The doctrine applies when "it may be impossible to pinpoint the exact date of a particular negligent act . . . that caused injury or where the negligence consists of a series of acts . . . and it is appropriate to allow the course of action to terminate before allowing the repose section of the statute of limitations to run." *Giulietti v. Giulietti*, 65 Conn. App. 813, 834 (2001) (quotation marks, citations and alterations omitted).

Application of the continuing course of conduct doctrine thus arises most often in cases where a fiduciary relationship exists between the parties during the time the conduct complained of transpired. *See Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 307–09 (2014). It is well settled that "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (2000). "In the seminal cases in which [the Connecticut Supreme Court] has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating

a relationship of dependency, or was under a specific duty to act for the benefit of another." *Id.*

Here, at the time that the 2002 Sun West letter was sent by facsimile, CSL and Midsun had terminated their distributorship agreement, and were, by all accounts, competitors in the same field. There is no evidence to support on an ongoing breach of duty, nor is it "impossible to pinpoint" when the alleged defamatory statements were made. Thus, an application of the continuing course of conduct toll is not supported in these circumstances. *See Venables v. Bell*, 941 F. Supp. 26, 27 (D. Conn. 1996) (finding that "even assuming the plaintiff's allegations to be true, his reliance on the continuing course of conduct doctrine is misplaced" where the parties' fiduciary relationship terminated prior to plaintiff becoming aware of the factual basis for his claims). Accordingly, the 2002 Sun West communication cannot form the basis of a CUTPA counterclaim against CSL.

## 2. Epsilon India Communications

Midsun also claims that upon several occasions in 2015, 2016, and 2017, it was informed that an India-based CSL employee had been making disparaging and defamatory remarks and written statements to third parties within India. The source of this information was Midsun's foreign customer/distributor, Epsilon India. Epsilon India sent an email to Midsun on April 20, 2015, attaching an unsigned, undated document, entitled "Facts of EPSILON INDIA PRIVATE LIMITED, New Delhi and MIDSUN Group Inc. USA". Doc. 128-2 at 49. The document contained several allegations about the quality and source of Midsun's products. *Id.* at 42, 49-52. According to Epsilon India, the document in question had been circulated by "an agent" of CSL. *Id.* at 43.

On December 28, 2016, Epsilon India's managing director, Neelesh Arora, sent another email to several individuals at Midsun, with the subject "CSL Defamation Case." *Id.* at 58. The email states that a "CSL India employee called Mr. A. Natarajan visited NTPC and told them last week that we

import Midsun 570 coating that is supposedly manufactured in the USA, but is actually made in China. . . . We are allegedly misrepresenting the Country of Origin for Midsun 570 to NTPC. I got a call from the NTPC Vigilance Department cross-questioning me." *Id.*

On January 5, 2017, Mr. Arora once again wrote to Midsun, "Powergrid, the largest transmission company in India, told me this morning that the CSL rep claimed our coating was made in China. They want to see the Waukesha plant as well." *Id.* at 57. Attached to the email is a document that references statements attributed to "A. Natarajan," an individual purported to be the India-based manager for CSL, concerning the country of origin of Midsun's '570' product. *Id.* at 59.

CSL argues that as a matter of law, the statements made in these three emails cannot serve to create liability under CUTPA, as the statements were not made within Connecticut, and only conduct that occurs in this state is actionable under CUTPA.

As noted above, CUTPA defines 'trade' and 'commerce' as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state*." Conn. Gen. Stat. § 42-110a(4) (emphasis added). A strict reading of the statute supports the conclusion that CUTPA requires that the violative conduct complained of occur in Connecticut. Courts addressing the issue, however, have permitted an out-of-state violation to serve as the basis for a CUTPA claim where the violation itself "is tied to a form of trade or commerce intimately associated with Connecticut, or if, where Connecticut choice of law principles are applicable, those principals dictate application of Connecticut law." *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005) (quotation marks and citations omitted), *opinion adhered to as modified on reconsideration*, 409 F. Supp. 2d

112 (D. Conn. 2006). *See, e.g., Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 145 (D. Conn. 2015); *Bulldog New York LLC v. Pepsico, Inc.* 8 F. Supp. 3d 152, 166 (D. Conn. 2014); *PTI Assocs., LLC v. Carolina Int'l Sales Co.,* No. 3:09-CV-849(WWE), 2010 WL 363330, at *5-6 (D. Conn. Jan. 26, 2010), *order clarified on reconsideration*, No. 3:09-CV-949(WWE), 2010 WL 617374 (D. Conn. Feb. 18, 2010); *Titan Sports, Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65, 71 (D. Conn. 1997); *Uniroyal Chem. Co. v. Drexel Chem. Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996).

Midsun acknowledges that the statements were made in India, but argues that its principal place of business is in Connecticut; CSL competes with Midsun in Connecticut; the allegedly disparaging remarks "made their way into Connecticut by way of emails" to Midsun's CEO, "caus[ing] Midsun to contact its Connecticut attorney"; and the potential diversion of foreign sales away from Midsun would result in revenue not realized in Connecticut. Doc. 128-1 at 19. Midsun thus posits that there is a sufficient connection with Connecticut to maintain its cause of action under CUTPA for these India-based statements.

The Court disagrees. The alleged violations forming the basis of this CUTPA claim – the allegedly disparaging remarks – are not "tied to a form of trade or commerce intimately associated" with Connecticut. The fact that Midsun's principal place of business is located in Connecticut (and that, as a result, an economic impact may be felt in Connecticut) is not sufficient by itself to tie the alleged violative conduct to Connecticut. *See PTI Assocs., LLC*, 2010 WL 36330, at *5-6 (finding that allegations of economic impact within the state limited to those related to plaintiff's principal place of business being in Connecticut are insufficient to establish a cause of action under CUTPA).

Nor does the fact that such statements made their way into Connecticut by emails from Midsun's customer to Midsun's executives support a connection with Connecticut sufficient to

maintain a CUTPA claim. The case that Midsun relies on for this proposition does not provide strong support for its argument, as it is distinguishable on its facts. In *Titan Sports, Inc.*, 981 F. Supp at 71, the plaintiff, a promoter of professional wrestling under the registered service mark World Wrestling Federation, alleged that the defendants had engaged in unfair trade practices by using television programs, pay-per-view broadcasts, and a telephone pay-hotline to deceive consumers. *Id.* at 71. Such television programs aired in the state of Connecticut; the pay-per-view shows were broadcast in Connecticut; Connecticut residents had called the telephone hotline; and the plaintiff's principal place of business was in Connecticut. *Id.* at 72. The Court therefore found that there was a sufficient nexus between the unfair methods of competition alleged and the state of Connecticut to survive a motion to dismiss. *Id.*

Here, in contrast, there is not even an allegation that the alleged defamatory statements were received by Midsun's Connecticut customers. All that Midsun offers to bridge the alleged CUTPA violation – the India-based defamatory statements – to Connecticut is receipt of emails containing the statements in Connecticut by *Midsun's president*, sent by *Midsun's customer*. There is no evidence that any potential customer of either party received the statements in Connecticut. Thus, the facts do not support a finding that the violation was tied to a form of trade intimately associated with Connecticut.[18]

Finally, and more fundamentally, even were it shown that such statements were sufficiently tied to trade intimately associated with Connecticut, there is no admissible evidence establishing that

_____

[18] The Court notes that in support of their respective positions, the parties each rely on case law that discusses contacts with Connecticut in the context of the scope of Connecticut's Long-Arm statute and a court's ability to exercise personal jurisdiction over a defendant. Here, personal jurisdiction is not at issue, and thus, these cases are inapposite.

statements were made or authored by CSL.[19] Midsun claims that statements were made to third

parties; this information was relayed by said third-parties to Epsilon, a Midsun customer; and

Epsilon in turn informed Midsun of the existence of such statements third-hand. "When challenged

on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory

allegations that the slanderous statement was made." *Albert v. Loksen*, 239 F.3d 256, 266 (2d Cir.

2001) (collecting cases); *see also Johnson v. Chesebrough-Pond's USA Co.,* 918 F. Supp. 543, 552

(D. Conn. 1996) (granting summary judgment on a defamation claim where plaintiff offered only

hearsay evidence that such statements were made), *aff'd sub nom. Johnson v. Chesebrough-Ponds,*

*Inc.,* 104 F.3d 355 (2d Cir. 1996). As there is no admissible evidence that the statements in question

were made by CSL, they are insufficient to raise a genuine issue of fact that would warrant denial

of CSL's motion.

### 3.  Faisal Huda Testimony

---

[19] Counsel for Midsun conceded as such during oral argument, during the following exchange:

| | |
|---|---|
| The Court: | And who is the author of those disparaging statements? |
| Ms. Morris: | The issue here is -- |
| The Court: | Who said that? |
| Ms. Morris: | This is a communication that came to Midsun from a third party which references both Midsun and CSL. |
| The Court: | Yes, but to hold someone for defamation, don't you have to say – show that the defendant said something. |
| Ms. Morris: | The issue is this, your Honor, and I agree with the court. Of course, you have to show that they have said something, but these are recurring themes that go all the way back to 2002. . . . |

*Id.* at 174. Counsel, in referencing the later statements, then acknowledges that "the earlier statements, which we agree, can't be directly attributed to CSL, but it's curious that those same 2015 documents only reference Midsun and CSL." *Id.* at 176.

Midsun also points to the testimony of CSL's CEO, Faisal Huda, as evidence that disparaging or defamatory statements about Midsun were made by CSL during the relevant time frame. Huda testified that in the past, he had personally stated that Midsun's product "resembles a roof coating, highly resembles a roof coating." Testimony of Faisal Huda, Doc. 128-2 at 79-80. Huda could not recall the last time he said that. *Id.* at 81. He further testified that CSL had used "the fact that they believe that Midsun is selling roof coating" in its presentations, but he could not say where he had made those statements, and could not definitively confirm nor deny that such statements were made in the United States. *Id.* at 77. Huda testified that he doesn't "agree that [such a statement is] disparagement . . . . It's just the truth of what CSL knows to be the case." *Id.*

Midsun asks this Court to deny partial summary judgment to CSL on the basis of this testimony. Such testimony, however, does not raise a genuine issue of fact. *First*, no evidence is submitted as to when and where the statements were made. In conclusory fashion, Midsun submits that the Court should view the testimony in the light most favorable to Midsun, and find that they "could well have been" made in Connecticut within the statute of limitations, because CSL competes with Midsun in Connecticut and has made sales in Connecticut during the relevant time period. Doc. 128-1 at 18. Such surmise and conjecture cannot create a genuine issue of fact. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." (quotation marks and citations omitted)). Without admissible evidence that CSL

made defamatory or disparaging statements in Connecticut during the relevant time period, Midsun cannot raise a genuine issue of fact to defeat CSL's motion for summary judgment on this ground.

*Second*, in Connecticut, "to be actionable in defamation, the offending statement must convey an objective fact rather than an opinion." *Hewett v. Murray*, No. 3:12-CV-558(WWE), 2012 WL 6042168, at *2 (D. Conn. Dec. 4, 2012) (citing *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 795-96 (1999)). "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . . An opinion, on the other hand, is a personal *comment* about another's conduct, qualifications or character that has some basis in fact." *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 111 (1982) (citations omitted). "In making this determination, a court may consider (1) the context and circumstances (2) the language used, and (3) whether the statement is objectively capable of being proved true or false." *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 101 (D. Conn. 2000) (citations omitted).

Here, the two statements attributed to CSL are that Midsun's product "*resembles* a roof coating, highly resembles a roof coating," Doc. 128-2 at 79 (emphasis added); and that CSL "*believe[s]* that Midsun is selling roof coating," *id.* at 77 (emphasis added). Both statements are non-actionable statements of opinions. Whether a substance resembles another substance is clearly a subjective statement that would be difficult to prove true or false. Thus, assuming, *arguendo*, that CSL made the statements within the statute of limitations, and in Connecticut, such statements would not rise to the level of a defamation or disparagement-based CUTPA violation as they convey matters of opinion, not objective fact, and are therefore insufficient to raise a triable issue of fact.

### 4. Energy Northwest Emails

Finally, in sur-reply, Midsun produces several email exchanges between Faisal Huda and

employees at Energy Northwest, a "former Midsun customer." Doc. 151 at 8. Midsun characterizes these emails as "defamatory or disparaging both under Connecticut common law and support Midsun's claims of unfair trade practices under CUTPA." *Id.* Midsun identifies four statements in the emails that are defamatory, and submit that they raise genuine issues of fact in regards to CSL's motion. Midsun argues that the emails imply that Midsun engaged in "trickery" which resulted in Energy Northwest choosing Midsun's product over CSL's in 2003. The Court will address each email in turn.

### a. September 15, 2016 Email from Faisal Huda to Brian Adami

At issue are statements in an email from Huda to Brian Adami, an employee of Energy Northwest, that "MIDSUN continues to use the [570] trademark without authorization or agreement from CSL." Doc. 151-1 at 5. Huda continues, "You will recall ENW mistakenly installed coating supplied by MIDSUN despite ENW having originally tested and approved the Si-COAT® 570TM HVIC material from CSL, and never having tested and approved the material from MIDSUN." *Id.* Midsun argues that these two statements imply that Midsun engaged in an "unethical or unlawful business practice," and are therefore defamatory. Doc. 151 at 8.

The allegedly defamatory statements must be read in the context of the entire email from Huda to Adami. After some initial pleasantries, Huda writes,

> For the past few years CSL has been organizing its case regarding the CSL '570' trademark. Midsun continues to use the trademark without authorization or agreement from CSL.
>
> Of primary concern is the confusion that two HVIC products labeled with '570' has caused and continues to cause. Energy Northwest (ENW) is at the centre of one example of this confusion. You will recall ENW mistakenly installed coating supplied by MIDSUN despite ENW having originally tested and approved the Si-COAT® 570TM HVIC material from CSL, and never having tested and approved

the material from MIDSUN. Luckily, we caught the error together and CSL helped ENW correct the situation by supplying material free of cost to ENW in order to re-coat your insulators.

Anyway, long story short, our USA legal counsel may have some questions for you. I have provided them your contact details and hope that if they do indeed contact you, it will not be an onerous imposition.

Thanks, as always, for your support and confidence in CSL. Please let me know if you have any concerns.

Doc. 151-1 at 5.

"It is well settled that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." *Hopkins v. O'Connor*, 282 Conn. 821, 830–31 (2007) (quotation marks and citations omitted). Moreover, "[t]he scope of privileged communication extends not merely to those made directly to a tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding." *Id.* at 832. In determining whether a privilege applies,

> the court must decide as a matter of law whether the alleged defamatory statements are sufficiently relevant to the issues involved in a proposed or ongoing judicial proceeding, so as to qualify for the privilege. The test for relevancy is generous, and "judicial proceeding" has been defined liberally to encompass much more than civil litigation or criminal trials.

*Id.* at 839 (citation omitted).

The Connecticut Supreme Court's discussion of this privilege in *Kelley v. Bonney*, 221 Conn. 549 (1992) is particularly instructive here:

> To accomplish the purpose of judicial or quasi-judicial proceedings, it is obvious that the parties or persons interested must confer and must marshal their evidence for presentation at the hearing . . . unchilled by the thought of subsequent judicial action against such participants; provided always, of course, that such preliminary meetings, conduct and activities are directed toward the achievement of the objects of the litigation or other proceedings.

*Id.* at 606 A.2d 693, 706 (1992) (quoting *Brody v. Montalbano*, 87 Cal.App. 3d 725, 729 (1978)) (quotation marks omitted).

It is clear from the entirety of the email that Huda is writing to inform Adami – a potential witness – about this lawsuit; indeed, to marshal evidence to be used in support of CSL's claims. *See Kelley*, 221 Conn. at 706. The first statement which Midsun alleges to be defamatory – that Midsun uses the 570 and 579 mark "without authorization or agreement from CSL" – forms the crux of CSL's complaint against Midsun, and this statement immediately follows the statement of the fact that CSL is pursuing legal action against Midsun. *See* Doc. 151 at 8; *see generally* Complaint, Doc. 1. This statement, read in the context of the entire email, simply restates the allegations in the complaint and is therefore privileged.

The second statement that Midsun finds actionable – that "ENW mistakenly installed coating supplied by MIDSUN" – is preceded by the words, "[y]ou will recall." In addition to the statement falling under the above privilege, there is no allegation or evidence that the statement is false, which is one of the requirements for defamation.[20] Accordingly, this statement is not actionable as a matter of law.

### b. October 1, 2016, Email from Huda to Adami

Midsun alleges that the following statement, made from Huda to Adami in a subsequent

---

[20] In fact, quite the opposite, it appears the statement may be true. In a later email, Adami writes to another individual at his company, relaying the story of how Energy Northwest did indeed appear to unintentionally use Midsun's product. *See* Doc. 151-1 at 8 ("While we extensively tested the CSL version and had it approved back in 1992 through a vigorous process, we ended up using Midsun's product (a product we never did field or lab tests on) to do the first recoat."). This appears to confirm that Huda's statement prompting Adami to recollect past events relayed true information.

email, is defamatory: "You are right to point out that this has nothing to do with ENW's actions, but how ENW and others have (and may have) fallen victim to issues of confusion surrounding branding practices of suppliers." Doc. 151-1 at 7. "A required element of a prima facie case of defamation is that an allegedly defamatory statement must identify the plaintiff to a third person." *Devone*, 2014 WL 1153773, at *8 (collecting cases). This statement does not mention Midsun specifically. Further, it repeats the allegations in CSL's complaint regarding its trademark infringement claims, and is therefore privileged. Accordingly, this statement is not actionable defamation.

### c. September 30, 2016, Email from Adami to Timothy Croyle

The next email Midsun relies upon was sent from Adami to Timothy Croyle, another Energy Northwest employee. Huda and Winemiller, a CSL attorney, are copied on the email. Adami writes: "I think that we certainly can still shore up our design documents to protect ourselves from some errant procurement in the future happening due to a particularly good salesman showing up on our doorstep and talking us into it." Doc. 151-1 at 8. He further states, "[Mr. Winemiller, CSL's attorney] is helping CSL to put pressure on Midsun to drop the 570 number from their product." *Id.*

It is not alleged that these statements were made by CSL. Instead, Midsun asks the Court to impute the statements made by a third-party to CSL because the "statements would not have been made but for Mr. Huda['s] request for support and assistance from Mr. Adami and others within Energy Northwest." Doc. 151 at 10. Midsun cites no authority for this position, nor could they. The law is clear that to establish a claim for defamation, Midsun must show that *the defendant* published a defamatory statement. *See Gleason v. Smolinski*, 319 Conn. 394, 430 (2015).[21] There is no

_____

[21] There is authority for joint and several liability in defamation actions in Connecticut. *See Miles v. Perry*, 11 Conn. App. 584, 607 (1987) ("The general rule is that whenever two or more persons co-operate in the publication of a libel, all are responsible for the resultant damages

allegation or evidence that Adami was under the control or employ of CSL, or that Energy Northwest acted in concert with CSL to defame Midsun. As CSL cannot be held liable for words written by Adami, this statement cannot form the basis of Midsun's counterclaims.

### d. November 14, 2016, Email from Romeo Tudor to Energy Northwest Employees

Finally, Midsun points to an email written by Romeo Tudor, an Energy Northwest employee, to other individuals at Energy Northwest. Tudor writes, "Midsun is a company selling diluted CSL products under Midsun brand at a lower price." Doc. 151-1 at 9. This statement fails to raise a genuine issue of fact for the same reasons explained above; namely, that the author of the statement is not a CSL employee and therefore such a statement cannot be imputed to CSL.

### C. Conclusion

In sum, CSL has demonstrated that it is entitled to summary judgment on Counts VII and VIII of Midsun's counterclaims, alleging CUTPA-based violations for disparagement and defamation, and on Count IX of Midsun's counterclaims, alleging a claim Lanham Act claim for false advertising. Midsun has failed to raise a triable issue of fact. Accordingly, CSL's *Motion for Partial Summary Judgment* [Doc. 120] is GRANTED.

## V. MIDSUN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR JUDICIAL NOTICE [Doc. 163]

Midsun seeks summary judgment on Count I of CSL's Complaint, a Lanham Act claim for

---

but of course there must be some degree of concert between the defamers; if they acted independently, they are not liable jointly, and may not be joined as defendants." (quotation marks, citation and alterations omitted)). However, Midsun does not allege this to be the case here, and there is no admissible evidence that would show the requisite concert of action to hold CSL responsible for the statements of Energy Northwest employees.

unfair competition for use of the '570' mark. Midsun also moves this Court to take judicial notice of Midsun's trademark application for the mark '570', Serial No. 85/758631, which was filed on October 19, 2012. The Court will address each motion in turn.

**A. Motion for Judicial Notice**

Midsun moves the Court to take judicial notice of the trademark application for the '570' mark that Midsun filed on October 19, 2012, at the PTO. CSL has not opposed this aspect of Midsun's motion. In its Complaint, CSL alleges that Midsun "is currently seeking registration of the following marks at the U.S. Patent and Trademark Office: U.S. Trademark Application Serial No. 85/758,631 (for '570') and U.S. Trademark Application Serial no. 86/311,799 (for 'Midsun 579')." Doc. 1 ¶19.

As previously discussed in this matter, it is proper for the Court to notice documents that establish that certain events central to the Complaint occurred. *See CSL Silicones Inc.*, 170 F. Supp. 3d at 309; *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quotation marks and citation omitted)). In particular, the Court "may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office." *Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 n.3 (S.D.N.Y. 2010) (citations omitted). Accordingly, the Court GRANTS Midsun's unopposed *Motion for Judicial Notice*.

**B. Ownership of the 570 Mark**

Midsun argues that it is entitled to summary judgment on CSL's Lanham Act claim of unfair

competition as to the '570' mark, because Midsun has a superior right to the mark. Specifically, Midsun argues that Midsun was the first to use the '570' mark in commerce in the United States, and that it has produced evidence of continuous use from the mid-1990's to present. As to ownership, Midsun asserts many of the same arguments that were raised in opposition to CSL's *Motion for Partial Summary Judgment* on Count I.

The Court has already determined that, as a matter of law, CSL was the first to use the '570' mark in commerce in the United States. Accordingly, for the reasons stated *supra*, Midsun's argument as to its priority in the mark – and its superior rights under the *Haggar* factors – fails. Further, it has been established that a material issue of fact exists as to whether CSL continuously used the mark from 1999 through 2003 in the United States. As this issue is reserved for the trier of fact, Midsun's motion for summary judgment on this issue is denied.

### C. Good Faith

Midsun argues that it adopted the '570' mark in good faith. It claims that CSL did not object to Midsun's practice of relabeling and repackaging CSL's product as 'Midsun 570' during the term of the 1995 Agreement; that Midsun relied on the advice of counsel in filing for the registration of the trademark 'Midsun 570'; and that there is no evidence of its intent to deceive the PTO.[22] In connection with CSL's motion for partial summary judgment, the Court previously determined that issues of fact exist as to whether Midsun adopted the '570' mark in good or bad faith. No additional information has been submitted here that would require summary judgment in Midsun's favor on the

---

[22] Midsun also advances a lengthy argument that CSL cannot prove its "fraud defense to Midsun's registrations," Doc. 164 at 32, and that it "cannot overcome the evidentiary burden of proving fraud[.]" *Id.* at 31. The Court declines to address this issue, as CSL has not asserted either a claim for fraud or a fraud defense to Midsun's counterclaims in this action.

issue of bad faith or willfulness. Accordingly, the question of Midsun's intent in this matter is reserved for the trier of fact.

### D. Equitable Defenses

The Court has already determined that there are questions of fact as to whether the 'unclean hands' doctrine applies; thus, Midsun's motion for summary judgment as to its remaining equitable defenses is denied.

## VI. MIDSUN'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. 160]

Finally, Midsun seeks summary judgment on Counts V and VI of CSL's Complaint, which allege Lanham Act claims for trademark infringement and unfair competition for use of the '579' mark.

### A. Ownership of the '579' Mark

Midsun argues that it has priority in the '579' mark. As the Court has already determined that CSL has established its ownership of the '579' mark as a matter of law, and that no genuine issue of fact as to fraud exists, Midsun's motion as to the ownership of the '579' mark is denied.

### B. Good Faith

Midsun contends that it adopted the '579' mark in good faith. The Court has previously determined that a material issue of fact exists as to whether Midsun's actions in adopting the marks in question were made in good or bad faith. Accordingly, Midsun's motion as to good faith is denied.

### C. Equitable Defenses

Midsun argues that the equitable defenses of laches and acquiescence bar CSL's claims. As the Court has determined that a material issue of fact exists as to whether Midsun has come to court with 'unclean hands,' Midsun's motion for summary judgment as to its equitable defenses is denied.

## VII.    CONCLUSION

For the foregoing reasons, CSL's *Motion for Partial Summary Judgment* [Doc. 170] is GRANTED IN PART and DENIED IN PART; CSL's *Motion for Partial Summary Judgment* [Doc. 120] is GRANTED; Midsun's *Motion for Partial Summary Judgment and for Judicial Notice* [Doc. 163] is GRANTED IN PART and DENIED IN PART; and *Midsun's Motion for Partial Summary Judgment* [Doc. 160] is DENIED.

Consistent with the Court's prior Scheduling Order [Doc. 67], the parties are directed to file a joint trial memorandum in the form required by this Court's Standing Order Regarding Trial Memoranda in Civil Cases on or before **May 14, 2018**. This case will then be placed on the Court calendar as trial ready, with a trial date to be determined subsequently.

**It is SO ORDERED.**

**Dated: New Haven, Connecticut**
**         March 15, 2018**

                                                    */s/ Charles S. Haight, Jr.*
                                                    **CHARLES S. HAIGHT, JR.**
                                                    **SENIOR UNITED STATES DISTRICT JUDGE**